Robert McLAUGHLIN, Thomas DiBiase, and Vincent Dibiase, Plaintiffs,

v.

Robert F. McCANN, Carol A. McCann, Kevin M. Lyons, and Joan E. Lyons, Defendants,

American Family Mortgage Company and American Family Mortgage Corporation, Nominal Defendants.

C.A. No. 3067–VCS.

Court of Chancery of Delaware.

Submitted: Jan. 15, 2008.
Decided: Feb. 21, 2008.

Sean J. Bellew, Esquire, David A. Felice, Esquire, Cozen O'Connor, Wilmington, Delaware, Attorneys for Plaintiffs.

Robert A. Penza, Esquire, Christopher M. Coggins, Esquire, Gordon, Fournaris & Mammarella, P.A., Wilmington, Delaware, Attorneys for Defendants.

## OPINION

STRINE, Vice Chancellor.

### I. *Introduction*

This dispute involves the familiar small business deal gone bad story. The agreement underlying the transaction contains an arbitration clause that one side of the transaction wishes to enforce and the other side wishes to avoid. The particular issue addressed in this decision is who—this court or an arbitrator—should decide whether and to what extent the parties' claims should be arbitrated. Because I find that the arbitration clause at issue provides clear and unmistakable evidence of the parties' intent to arbitrate arbitrability through a reference to the American Arbitration Association ("AAA") Rules, I compel arbitration on the issue of arbitrability and stay this action pending the arbitrator's decision.

### II. *Factual Background*

#### A. *The Underlying Transaction*

This dispute arises from the purchase of American Family Mortgage (also the "Business"), a Wilmington, Delaware based home mortgage lending business. American Family Mortgage provides mortgage lending and placement services to consumers in Delaware, Pennsylvania, New Jersey, Maryland, and Florida.[1] On June 30, 2005, Robert McLaughlin, Thomas DiBiase, and Vincent DiBiase (collectively the "Purchasers") bought American

---

1. Am. Compl. ¶ 11.

Family Mortgage from the McCanns, Robert F. McCann and his wife Carol A. McCann, and the Lyons, Kevin M. Lyons and his wife Joan E. Lyons (collectively the "Sellers").[2] The Purchase Agreement transferred all of the stock of American Family Mortgage Company (the "Company") from the Sellers to the Purchasers for $1.5 million, paid by $50,000 cash at closing and the remainder in ten-year promissory notes.[3] Paragraph 7.8 of the Purchase Agreement is an arbitration clause. That "Arbitration Clause" states:

> If a dispute arises under this agreement, the matter shall be admitted to arbitration in Media, PA in accordance with the rules of the American Arbitration Association then in force and the decision of the arbitrator shall be final and binding on both parties and the law of the State of Delaware will apply.[4]

As part of the transaction involving the transfer of the Business, the Purchasers and the Company signed two separate Promissory Notes in favor of the Sellers.[5] The Purchase Agreement expressly made the Promissory Notes part of the Purchase Agreement.[6] The Promissory Notes, which are identical in their terms except for the payee and the amount of the monthly payment, contain a separate dispute resolution provision that primarily addresses usury claims. That dispute resolution provision states:

> All rights and obligations hereunder shall be governed by the laws of the State of Delaware. Notwithstanding any provision herein or instrument now or hereafter securing this note, the total liability for payments in the nature of interest shall not exceed the limitations now imposed by the applicable laws of the state whose laws are controlling on the subject as shall be determined by final order of a court of competent jurisdiction.[7]

At some point after the Purchasers took possession of the Business, the Purchasers became aware that American Family Mortgage Corporation (the "Corporation") "owned or controlled all the licenses and relationships necessary for the [Business] to conduct mortgage lending business in Delaware and Pennsylvania."[8] Because the Purchase Agreement did not reference the Corporation and no physical transfer of the Corporation's stock took place at closing, the Purchasers and Sellers executed an agreement on January 9, 2006 (the "2006 Agreement") that recognized that they had intended to transfer *both* the Company and the Corporation as part of the sale of the Business at the time of the Purchase Agreement.[9] That 2006 Agree-

---

**2.** Purchasers Ans. Br. Ex. 5 ("Purchase Agreement").

**3.** *Id.* ¶ 2. The relative ownership percentages and the amount paid and received by particular Purchasers and Sellers are not relevant for the purposes of this opinion.

**4.** Purchase Agreement ¶ 7.8.

**5.** Purchasers Ans. Br. Exs. 6 & 7 ("Promissory Notes").

**6.** Purchase Agreement ¶ 7.5 ("[T]he Promissory Notes are attached hereto, made part hereof and marked Exhibit 'A.' ").

**7.** Promissory Notes.

**8.** Am. Compl. ¶ 29.

**9.** Purchasers Ans. Br. Ex. 11 ("2006 Agreement"). One of the whereas clauses explained that the "[Purchasers] in 2005 entered into an agreement to purchase [the Company] and [the Corporation] from the [Sellers]." *Id.* Despite the Purchasers' strained arguments to the contrary, the 2006 Agreement is indisputably referencing the Purchase Agreement and that 2006 Agreement, whether termed a subagreement, annex, amendment, or other such term, must be read as part of the overall Purchase Agreement. Beyond the overt reference to a 2005 agreement to sell the Business and that the transfer of the Corporation stock turned out

ment was signed by all the Purchasers but only Robert McCann and Kevin Lyons from the Sellers' side. The 2006 Agreement, which also recognized that the physical stock certificates of the Corporation were lost,[10] "certif[ied]" that McCann and Lyons were the sole owners of the Corporation at the time of the 2005 transfer of the Business and "confirm[ed]" that "their 2005 agreement with [the] Purchasers authorizes [the] Purchasers to issue stock to [the] Purchasers in the percentage set forth in" the 2006 Agreement.[11] The ownership percentages in the 2006 Agreement were, unsurprisingly, the same ownership percentages set forth in the Purchase Agreement.[12]

From the June 30, 2005 closing until April 2007—a period of nearly two years—the Purchasers operated the Business and paid the Sellers monthly in accordance with the Promissory Notes. In April 2007 the Purchasers stated that the Business could not continue to make payments to the Sellers and that the Purchasers were returning the Business to the Sellers.[13] The Purchasers allege that the return of the business was completed by July 2007.[14]

### B. *The Legal Dispute*

On July 2, 2007, the Purchasers filed a complaint in this court instituting suit against the Sellers. That complaint, as amended on August 8, 2007, contains five counts. Count one demands a declaratory judgment that, among other things, the Purchasers have no personal liability under the Purchase Agreement and Promissory Notes and that those agreements are void or voidable. Count two seeks rescission or rescissory damages based on fraud and fraud in the inducement. Count three alleges mutual mistake or unilateral mistake with fraud. Counts four and five are defamation and tortious interference with contractual relations claims based on the Sellers' comments to regulators and others in the mortgage industry about the Purchasers.

The Sellers responded by filing a demand for arbitration on July 16, citing the Arbitration Clause.[15] That arbitration is proceeding and an arbitration hearing is set for April 21, 2008.[16] The Sellers followed the demand for arbitration by filing a motion to dismiss and compel arbitration with this court on August 8, 2007. The Purchasers filed a motion to stay arbitration with this court on November 8, 2007. Those motions are the subject of this opinion.

### III. *Legal Analysis*

■ When the issue of arbitration is raised during litigation, the parties' dispute over the merits of the claims being litigated yields to two threshold issues: (1) whether those claims should be resolved in

---

to be practically necessary to effect the transfer of the Business, the conclusion that the 2006 Agreement is part of the performance of the Purchase Agreement as opposed to a stand-alone agreement to transfer the Corporation is supported by the absence of an additional price term in the 2006 Agreement for the shares of the Corporation. This makes clear that the 2006 Agreement was simply a clarification of the prior Purchase Agreement, by which the entirety of the Business, including both the Company and the Corporation, was to be transferred for the price set forth in the Purchase Agreement.

**10.** *Id.*

**11.** *Id.*

**12.** *Compare id. with* Purchase Agreement ¶ 1.

**13.** Am. Compl. ¶¶ 32, 37.

**14.** Am. Compl. ¶¶ 41–42.

**15.** Purchasers Ans. Br. Ex. 1.

**16.** Sellers Rep. Br. Ex. A at 2.

arbitration (the issue of arbitrability); and (2) whether the issue of arbitrability should be decided by the court or the arbitrator (the issue of substantive arbitrability).[17] In addressing the competing motions to compel arbitration and stay arbitration, the parties take up both of those issues. Because I find that the arbitrator should decide the arbitrability of the Purchasers' claims, I focus on the parties' arguments on that issue and leave their arguments about the arbitrability of the claims to the arbitrator.

The Purchasers make essentially two arguments in support of their contention that this court, rather than the arbitrator, should determine if and to what extent the parties' dispute should be arbitrated. First, the Purchasers argue that this court should decide arbitrability because the Arbitration Clause in the Purchase Agreement does not generally refer all controversies to arbitration and therefore there is not clear and unmistakable evidence of the parties' intent to submit the issue of substantive arbitrability to the arbitrator. The Purchasers also argue that the present dispute is not subject to the Arbitration Clause because it relates to the Corporation, which was not mentioned in the Purchase Agreement or Promissory Notes. By contrast, the Sellers argue that the Arbitration Clause in the Purchase Agreement does generally refer all controversies to arbitration. The Sellers also assert that

the 2006 Agreement merely reflects the parties' intention to transfer the Corporation's stock under the Purchase Agreement and that therefore any dispute arising from the transfer of the Corporation's stock is subject to the Arbitration Clause contained in the Purchase Agreement.

 Because the Purchase Agreement involves interstate commerce, calls for arbitration in Pennsylvania and is not subject to the Delaware Uniform Arbitration Act, the Federal Arbitration Act ("FAA") governs my consideration of this case.[18] The FAA requires that upon application of a party to a suit brought in court, the court shall stay the court proceeding "upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration" under an arbitration agreement.[19] "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally ... should apply ordinary state-law principles that govern the formation of contracts."[20] In general, "*any doubts* concerning the scope of arbitrable issues should be resolved in favor of arbitration."[21] In applying those traditional state contract law principles to make a determination on substantive arbitrability, however, the presumption favoring arbitrability is reversed: "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and

**17.** *See First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 942, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995).

**18.** 9 U.S.C. §§ 1–2; *James & Jackson, LLC v. Willie Gary, LLC,* 906 A.2d 76, 80 (Del.2006) (citing *Allied–Bruce Terminix Cos., Inc. v. Dobson,* 513 U.S. 265, 273–74, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995)).

**19.** 9 U.S.C. § 3.

**20.** *First Options,* 514 U.S. at 944, 115 S.Ct. 1920.

**21.** *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (emphasis added) (internal quotation omitted); *see also Parfi Holding AB v. Mirror Image Internet, Inc.,* 817 A.2d 149, 155–56 (Del.2002) ("When parties to an agreement decide that they will submit their claims to arbitration, Delaware courts strive to honor the reasonable expectations of the parties and ordinarily resolve any doubt as to arbitrability in favor of arbitration.").

unmistakabl[e]' evidence that they did so."[22]

In *Willie Gary, LLC v. James & Jackson, LLC*,[23] I considered the issue of whether a reference to the AAA Rules, which state that an arbitrator has the power to rule on his or her own jurisdiction,[24] provides clear and unmistakable evidence of an intent to arbitrate arbitrability. I noted that although the weight of federal precedent suggested the answer to that question was yes, I could not, being true to the United States Supreme Court requirement that there be clear and unmistakable evidence of the parties' intent to have the issue of arbitrability decided by the arbitrator, find that a mere decision by parties to have their arbitrable disputes arbitrated under the AAA Rules provided clear and unmistakable evidence of an intent to arbitrate arbitrability.[25] I did, however, recognize the strong efficiency basis for the federal majority view and stated:

> It may be that our Supreme Court might, for good reason, wish to follow the weight of federal authority by holding as a matter of law that a contractual clause calling for arbitration of a class of disputes under the AAA Rules evinces a clear and unmistakable intent to arbitrate arbitrability questions. Such a ruling would turn such a reference into a term of art on the subject of arbitrabili-

ty and arguably be economically efficient as a general policy rule. To date, our Supreme Court has not done so, and I cannot rest my ruling on the notion that the parties to the LLC Agreement knew that merely by choosing AAA to handle certain disputes, they therefore also were binding themselves to the AAA arbitrator's ruling on questions of arbitrability.[26]

Finding that there was no clear and unmistakable evidence of the parties' intent to arbitrate arbitrability, I proceeded to analyze the arbitrability of the plaintiff's claims and ultimately determined that the plaintiff was not required to arbitrate its claims.[27]

The Delaware Supreme Court affirmed my decision, but did so in an unusual manner. In addressing the federal majority view on the effect of a reference to the AAA Rules on substantive arbitrability, the Delaware Supreme Court stated:

> As a matter of policy, we adopt the majority federal view that reference to the AAA rules evidences a clear and unmistakable intent to submit arbitrability issues to an arbitrator. We do so in the belief that Delaware benefits from adopting a widely held interpretation of the applicable rule, as long as

**22.** *First Options*, 514 U.S. at 944–45, 115 S.Ct. 1920 (explaining that the differing presumption is understandable because the "who (primarily) should decide arbitrability question [ ] is rather arcane" and "given the principle that a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration, one can understand why courts might hesitate to interpret silence or ambiguity on the who should decide arbitrability point as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide") (internal quotation omitted).

**23.** 2006 WL 75309 (Del.Ch. Jan. 10, 2006).

**24.** AAA Commercial Arbitration Rule R–7(a), *available at* http://www.adr.org/sp.asp?id= 22440# R7 ("The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.").

**25.** *Willie Gary*, 2006 WL 75309, at *6–8.

**26.** *Id.* at *8.

**27.** *Id.* at *8–11.

that interpretation is not unreasonable. The majority view does not, however, mandate that arbitrators decide arbitrability in *all* cases where an arbitration clause incorporates the AAA rules. Rather, it applies in those cases where the arbitration clause generally provides for arbitration of all disputes and also incorporates a set of arbitration rules that empower arbitrators to decide arbitrability.[28]

Despite its differing view on the effect of a reference to the AAA Rules, the Delaware Supreme Court affirmed my decision. It explained its reasoning as follows:

> In this case, the arbitration clause begins by requiring arbitration of any controversy arising out of or relating to the LLC Agreement in accordance with the AAA rules. But it continues by expressly authorizing the nonbreaching Members to obtain injunctive relief and specific performance in the courts. Thus, despite the broad language at the outset, not all disputes must be referred to arbitration. Since this arbitration clause does not generally refer all controversies to arbitration, the federal majority rule does not apply, and something other than the incorporation of the AAA rules would be needed to establish that the parties intended to submit arbitrability questions to an arbitrator. There being no such clear and unmistakable evidence of intent, the trial court properly undertook the determination of substantive arbitrability.[29]

I confess that I find the standard adopted by the Delaware Supreme Court in *Willie Gary* a bit puzzling because, if read with great literality, it defeats the efficiency rationale that underlies the federal majority view. The primary advantage of the federal majority view is that once it has been determined that an arbitration clause references the rules of an arbitral body that authorize the arbitrator to decide the issue of arbitrability, the trial court is not required to delve into the scope of the arbitration clause and the details of the contract and pending lawsuit—that is the job of the arbitrator. The Delaware Supreme Court's interpretation of the federal majority view requires that "the arbitration clause generally provides for the arbitration of all disputes" for the federal majority view to take effect.[30] Thus, the Delaware Supreme Court's interpretation of the federal majority view could be read to strip away the efficiency of interpreting a reference to the AAA Rules as a heuristic to avoid a deep inquiry into the parties' intent to arbitrate arbitrability.

I also find the *Willie Gary* requirement that "the arbitration clause generally provides for arbitration of all disputes" less than clear.[31] One might interpret that requirement to mean that an arbitration clause must refer all disputes to arbitration without exception for the federal majority view to apply. Although I acknowledge that that interpretation is a plausible one,[32] there are several reasons I do not

---

28. *Willie Gary*, 906 A.2d at 80 (emphasis in original).

29. *Id.* at 80.

30. *Id.* at 81.

31. *Willie Gary*, 906 A.2d at 80.

32. *See Apollo Computer, Inc. v. Berg*, 886 F.2d 469, 473 (1st Cir.1989) ("By contracting to have all disputes resolved according to the Rules of the ICC, however, Apollo agreed to be bound by Articles 8.3 and 8.4."). *Compare Contec Corp. v. Remote Solution Co., Ltd.*, 398 F.3d 205, 211 (2d Cir.2005) ("We therefore conclude that as a signatory to a contract containing an arbitration clause and incorporating by reference the AAA Rules, Remote Solution cannot now disown its agreed-to obligation to arbitrate *all* disputes, including the

believe that is what the Delaware Supreme Court meant when it adopted that standard. First, one of the cases the Delaware Supreme Court cited for the "generally provides for arbitration of all disputes" requirement found that a reference to the AAA Rules was sufficient even though one of the parties argued that the arbitration clause contained a material exception.[33] Second, one of the alternatives to a reference to the AAA Rules that many federal courts have found to indicate a clear and unmistakable intent to arbitrate arbitrability is that the arbitration clause refers any and all disputes to arbitration.[34] Thus,

question of arbitrability.") *with id.* at 208 ("We have held that when, as here, parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator.") (citing *Shaw Group Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 122 (2d Cir.2003); *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1202 (2d Cir.1996)).

**33.** *See Cong. Constr. Co. v. Geer Woods, Inc.*, 2005 WL 3657933, at *2–3 (D.Conn.2005) (finding that a reference to the AAA Rules was clear and unmistakable evidence of an intent to arbitrate arbitrability even though the arbitration clause "contained language that [the plaintiff] believe[d] except[ed] consequential damage claims from arbitration").

**34.** *See Oriental Republic of Uruguay v. Chem. Overseas Holdings, Inc.*, 2006 WL 164967, at *5 (S.D.N.Y.2006) ("[P]arties may overcome the *First Options* presumption [against arbitrability] by entering into a[n] ... agreement that (1) employs ... 'any and all' language ..., or (2) expressly incorporates the provisions of [a tribunal that requires questions of arbitrability to be decided in arbitration].'") (quoting *John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 55 (2d Cir.2001)); *see also Bell v. Cendant Corp.*, 293 F.3d 563, 567–69 (2d Cir.2002) ("Under Connecticut law, an intent to refer the matter to the arbitrator may be indicated by an express provision or through the use of broad terms to describe the scope of arbitration, such as all questions in dispute and all claims arising out of the contract or any dispute that cannot be adjudicated.") (internal quotation omitted).

Although I acknowledge the federal precedent, primarily from the Second Circuit, suggesting that a broad arbitration clause provides clear and unmistakable evidence that the parties intended to submit the issue of arbitrability to the arbitrator, I am not persuaded by that line of reasoning. One consideration underlying the federal precedent might be that if the parties agreed to arbitrate most or all of their claims, then it is likely that they agreed to arbitrate arbitrability. That, of course, goes against Justice Breyer's assessment in *First Options* that arbitrability is an arcane question that parties do not necessarily think about when agreeing to arbitration clauses. *See First Options*, 514 U.S. at 944, 115 S.Ct. 1920 ("A party often might not focus upon that question or upon the significance of having arbitrators decide the scope of their own powers."); *see also Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775, 780 (10th Cir.1998) ("[A]lthough the arbitration clause in the Manufacturing Agreement is broadly written, referring to 'any and all disputes arising out of or relating to' the contract, there is no hint in the text of the clause or elsewhere in the contract that the parties expressed a specific intent to submit to an arbitrator the question whether an agreement to arbitrate exists."); *Virginia Carolina Tools, Inc. v. Int'l Tool Supply, Inc.*, 984 F.2d 113, 117 (4th Cir.1993) ("We need not decide if anything short of a specific, express provision, such as 'all disputes concerning the arbitrability of particular disputes under this contract are hereby committed to arbitration,' would meet this test. It suffices to say that the typical, broad arbitration clause in the option agreement at issue here—which contains nothing approaching such a provision—does not.... [The broad arbitration clause] does not 'clearly and unmistakably' commit arbitrability issues to arbitration."). An alternate impulse underlying the federal precedent could be that the broader an arbitration clause is the more likely it is that the parties intended to arbitrate any given claim. Therefore, there is less of a chance that the arbitrator would decide the arbitrability of a given claim in a way that would defeat the parties' agreement. It is a vast leap, however, from that conclusion to the determination that the parties agreed to have the arbitrator, rather than a court, decide which claims are arbitrable.

interpreting the "generally provides for arbitration of all disputes" requirement to mean all disputes without exception would mean that the Delaware Supreme Court interpreted the federal majority view, at least as applied by those federal courts, as giving no independent weight to a reference to the AAA Rules. That goes against the general tenor of the *Willie Gary* opinion, which indicates that the Delaware Supreme Court believes a reference to the AAA Rules has a critically important role in determining whether the parties intended to arbitrate arbitrability.

 What I take away from the "generally provides for arbitration of all disputes" requirement is that the carveouts and exceptions to committing disputes to arbitration should not be so obviously broad and substantial as to overcome a heavy presumption that the parties agreed by referencing the AAA Rules and deciding to use AAA arbitration to resolve a wide range of disputes that the arbitrator, and not a court, would resolve disputes about substantive arbitrability.[35] In a case where there is any rational basis for doubt about that, the court should defer to arbitration, leaving the arbitrator to determine what is or is not before her.[36] By this approach, this court can achieve the efficiency contemplated by the Supreme Court's *Willie Gary* decision.[37] This approach is analogous to the approach recently taken in *BAYPO Ltd. Partnership v. Technology JV, LP*, where this court found that a narrowly tailored exception to an arbitration clause that otherwise submitted all disputes to arbitration did not negate the conclusion that a reference to the AAA Rules provided evidence of the parties' clear and unmistakable intent to arbitrate arbitrability.[38]

**35.** *See* COMPACT OXFORD ENGLISH DICTIONARY (3d ed.2005), *available at* http://www.askoxford.com/concise_oed/generally? (defining generally as "in most cases").

**36.** Of course, even in a situation when the parties choose to have their arbitrable disputes handled under the AAA Rules, the parties can conclusively rebut the *Willie Gary* presumption and remove any doubts by explicitly stating that questions of substantive arbitrability shall nonetheless be determined by a court and not the arbitrator.

**37.** In adopting this approach, I do not abandon my belief that the mere decision by parties to use the AAA as the dispute resolution service is not the type of clear and unmistakable evidence of an intent to arbitrate substantive arbitrability that Justice Breyer originally contemplated in *First Options. See Willie Gary*, 2006 WL 75309, at \*6–8. Rather, this approach is an acknowledgement of the Delaware Supreme Court's sensible policy decision to adopt the efficiency-motivated federal majority view and that interpreting *Willie Gary* as requiring this court to perform a searching inquiry for clear and unmistakable evidence of an intent to arbitrate arbitrability in the face of a reference to the AAA Rules would, absent overt evidence that the parties did not intend to arbitrate arbitrability, undermine *Willie Gary*. In other words, it would be inefficient to adopt the federal majority rule for efficiency's sake and then interpret an exception to the federal majority rule in a way that would except a sizeable number of a cases to which the rule would apply in the first instance. The federal majority rule, like any other standard of review, should be interpreted and applied in a manner that makes the standard meaningful, useful, and true to its purpose. In making these statements, I do not shy away from observing that many federal court decisions have applied the federal majority view in a way that diminishes its efficiency. *See, e.g., Cong. Constr. Co.*, 2005 WL 3657933, at \*2–3 (concluding based on a reference to the AAA Rules but proceeding to determine that the language of the arbitration clause itself was also clear and unmistakable evidence of the parties' intent to arbitrate arbitrability); *Citifinancial, Inc. v. Newton*, 359 F.Supp.2d 545, 551–552 (S.D.Miss.2005) (concluding based on a reference to the AAA Rules but holding in the alternative that the underlying claims were arbitrable under the arbitration clause).

**38.** 2007 WL 4788449, at \*5 (Del.Ch. Oct. 2, 2007).

Applying *Willie Gary's* principles to this dispute leads to the conclusion that the Purchasers and Sellers clearly and unmistakably agreed to submit the issue of arbitrability to the arbitrator. The Arbitration Clause contains a reference to AAA Rules and provides for arbitration of a wide array of potential claims. The Purchasers' argument that the Arbitration Clause undercuts the *Willie Gary* presumption because it uses the language "aris[ing] under this agreement" rather than the broader language arising out of or relating to the agreement lacks logical force. The Purchasers hint at the weakness of that argument when they admit that the Arbitration Clause is a broad clause and that it goes "as far as the four corners of the Purchase Agreement (and possibly the Promissory Notes) will permit." [39] More importantly, in the *BAYPO* decision, this court found that a similar clause using the language "all disputes arising under the [a]greement" satisfied *Willie Gary*. [40] Likewise, the Purchasers' assertion that the arguable exception for the usury claims contained in the Promissory Notes rebuts the *Willie Gary* presumption fails. Even if an exception allowing judicial recourse for determination of whether "the total liability for payments in the nature of interest ... exceed[s] the limitations now imposed by the applicable laws of the state whose laws are controlling on the subject" exists, it is a very narrow exception that does not overcome the ·heavy presumption that the parties' reference to the AAA Rules and agreement to submit disputes to AAA arbitration signaled their intent to have disputes over arbitrability be resolved by an arbitrator.

■ I can briefly dispose of the Purchasers' argument that they did not agree to arbitrate anything regarding the Corporation, because that entity was not referenced in the original Purchase Agreement containing the Arbitration Clause, but rather in the later 2006 Agreement clarifying that the parties to the Purchase Agreement intended that that prior Agreement would transfer shares of the Corporation as well as the Company. As the Purchasers point out, the later 2006 Agreement was not signed by all the Sellers, because only Robert McCann and Kevin Lyons, and not their wives, signed on behalf of their families.

■ This trifle does not· create an exception to arbitrability. In my view, *Willie Gary* requires that a signatory to an agreement vesting questions of substantive arbitrability to the arbitrator must resolve disputes about arbitrability against a non-signatory before the arbitrator, unless the signatory can show that the non-signatory's contention that the underlying dispute is arbitrable is "wholly groundless." [41] In other words, absent a clear showing that

---

39. Purchasers Ans. Br. at 19.

40. *BAYPO*, 2007 WL 4788449, at *2, *5; cf. *CAPROC Manager, Inc. v. Policemen's & Firemen's Ret. Sys. of the City of Pontiac*, 2005 WL 937613, at *2 (Del.Ch.2005) (finding the language "arising under" to indicate a broad arbitration clause for the purpose of an arbitrability analysis).

41. *Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366, 1371 (Fed.Cir.2006) (internal quotation omitted); *see also Local 358, Bakery & Confectionery Workers v. Nolde Bros.*, 530 F.2d 548, 553 (4th Cir.1975) ("[T]he arbitrability of a dispute may itself be subject to arbitration if the parties have clearly so provided in the agreement. Of course, the court must decide the threshold question whether the parties have in fact conferred this power on the arbitrator. If they have, the court should stay proceedings pending the arbitrator's determination of his own jurisdiction, unless it is clear that the claim of arbitrability is wholly groundless."), *aff'd*, 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977).

the party desiring arbitration has essentially no non-frivolous argument about substantive arbitrability to make before the arbitrator, the court should require the signatory to address its arguments against arbitrability to the arbitrator. Otherwise, the efficiency gains contemplated by *Willie Gary* will be greatly undermined. It is not unusual for courts to require arbitration of claims involving parties who were not formally parties to an arbitration agreement, a situation that especially arises when affiliates of signatories are subject to or make claims.[42] In such situations, it is harder for signatories to escape arbitration when, as here, the non-signatories consent.[43]

In this case, the Sellers' contention that the Purchasers' claims relating to the Corporation are arbitrable does not come close to being obviously groundless. A plain reading of the later 2006 Agreement suggests that it was a clarification of the original Purchase Agreement and that it was to be read as part and parcel of that Agreement, and that any disputes relating to the later clarifying agreement were equally subject to the dispute resolution clause of the Purchase Agreement. That two of the Sellers did not formally sign the later clarifying agreement hardly makes the Sellers' contention that the Purchasers' claims are arbitrable wholly groundless, especially when the Sellers note that the later agreement simply made explicit what they had understood to be the substance of the Purchase Agreement all along and when the non-signing Sellers might plausibly be found to be bound to the later agreements by various theories. Therefore, whether the Purchasers' claims regarding the Corporation are arbitrable ought to be decided by the decisionmaker the Purchasers' chose—the arbitrator—and not this court. As the AAA Rules state, "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."[44] By agreeing to the Arbitration Clause calling for arbitration before the AAA Rules, the Purchasers, per *Willie Gary*, agreed that the arbitrator would decide what sweep the Arbitration Clause has.

Because I find that the parties agreed to arbitrate arbitrability and the Sellers' assertion of arbitrability is not wholly groundless, I stay this action in accordance with § 3 of the FAA pending the outcome

---

**42.** *See, e.g., Thomson–CSF, S.A. v. Am. Arbitration Ass'n,* 64 F.3d 773, 776 (2d Cir.1995) (noting that "a nonsignatory party may be bound to an arbitration agreement if so dictated by the ordinary principles of contract and agency" and listing incorporation by reference, assumption, agency, veil-piercing, and estoppel as theories that could bind nonsignatories to an arbitration agreement); *see also* 21 Richard A. Lord, Williston on Contracts § 57:19 (4th ed.2001) (same).

**43.** *See Contec Corp.,* 398 F.3d at 211 (noting that the difference between a non-signatory compelling a signatory to arbitrate and signatory compelling a non-signatory to arbitrate was material to that court, even though it was irrelevant to the Federal Circuit in *Microchip Tech. Inc. v. U.S. Philips Corp.,* 367 F.3d 1350, 1358 (Fed.Cir.2004), because "it [was] an important indicator of [the signatory's] expectation and intent when binding itself to the" agreement containing the arbitration clause); *see also Ishimaru v. Fung,* 2005 WL 2899680, at *18 (Del.Ch. Oct. 26, 2005) ("'[C]ourts have bound a signatory to arbitrate at the nonsignatory's insistence because of the close relationship between the entities involved, as well as the relationship of the alleged wrong to the nonsignatory's obligations and duties in the contract ... and [because] the claims were intimately founded in and intertwined with the underlying contract obligations.'") (internal quotations omitted).

**44.** AAA Commercial Arbitration Rule R–7(a), *available at* http://www.adr.org/sp.asp?id=22440# R7.

of the arbitrator's decision on the arbitrability of the claims.

### IV. *Conclusion*

For the foregoing reasons, the Sellers' motion to compel arbitration is GRANTED with respect to the arbitrating the arbitrability of the claims raised in this action and their motion to dismiss this case is DENIED. The Purchasers' motion to enjoin or stay arbitration is DENIED.