COURT OF CHANCERY
OF THE
STATE OF DELAWARE

SAM GLASSCOCK III
VICE CHANCELLOR

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DELAWARE 19947

Date Submitted: November 18, 2016
Date Decided: February 23, 2017

William M. Lafferty, Esquire
Kevin M. Coen, Esquire
Glenn R. McGillivray, Esquire
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
Wilmington, DE 19801

Kevin G. Abrams, Esquire
J. Peter Shindel, Jr., Esquire
Matthew L. Miller, Esquire
April M. Ferraro, Esquire
Abrams & Bayliss LLP
20 Montchanin Road, Suite 200
Wilmington, DE 19807

Timothy R. Dudderar, Esquire
Christopher G. Browne, Esquire
Potter Anderson & Corroon LLP
1313 N. Market Street
Wilmington, DE 19801

Bruce L. Silverstein, Esquire
Elena C. Norman, Esquire
Young Conaway Stargatt & Taylor LLP
1000 N. Market Street
Wilmington, DE 19801

Re: *Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P.*, Civil Action No. 12533-VCG

Dear Counsel:

This matter involves a contractual right to advancement of legal fees and costs, and, in the first instance, whether a dispute over that right must be adjudicated by this Court or in contractually-designated arbitration. Several motions are pending before me in this action. However, before reaching the merits of such motions I

must address the threshold issue of substantive arbitrability. All parties agree that Delaware law applies to that threshold issue,[1] and that the doctrine set forth in *James & Jackson, LLC v. Willie Gary, LLC*[2] and its progeny control the analysis. The intent of the parties controls. Here, the parties did not provide explicitly in the contract whether issues of arbitrability were for the arbitrator or left to this Court.

The resulting analysis under *Willie Gary* is contextual. Bright-line rules, while troubling to equity, often have great utility in informing drafting and interpretation of contracts. Nonetheless, no such rule obtains with respect to this issue. Under our case-law, arbitration clauses are read liberally in favor of arbitration, reflecting a policy bias in favor of quick and low-cost settlement of disputes where such is the parties' choice. The default rule, however, is that questions of substantive arbitrability—that is, whether an issue is subject to arbitration in the first instance—are for a court, unless the parties' contract clearly provides otherwise. The rationale for this default rule was recently explained by this Court: "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute" save those to which he has consented by contract.[3] Such contractual consent will be found where the contractual language specifically so

---

[1] *See* Oral Argument Tr. 7:15–23, 57:24–58:7.

[2] 906 A.2d 76 (Del. 2006).

[3] *Greenstar IH Rep, LLC v. Tutor Perini Corp.*, C.A. No. 12885-VCS, at 10 (Del. Ch. Feb. 23, 2017) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)).

states, obviously, but also by implication: Our law recognizes the parties' intent for substantive arbitrability to be decided by the arbitrator where an arbitration clause (1) "generally provides for arbitration of all disputes;" and (2) refers to "a set of arbitration rules that empower arbitrators to decide arbitrability," such as the American Arbitration Association ("AAA") Rules.[4]

The parties here have specified that the AAA rules apply.[5] This Letter Opinion, therefore, considers only the first issue above—is the arbitration clause broad in the sense that it generally provides for arbitration of all disputes, thus evincing an intent that substantive arbitrability is for the arbitrator, consistent with *Willie Gary*? Because I find the contract generally provides for arbitration of all disputes, this case must be stayed for a determination of arbitrability by the arbitrator. My reasoning follows.

## I. BACKGROUND

Because this Letter Opinion turns on the contractual choices of the parties the following adumbration of the underlying facts is sufficient to the issue before me.

Defendant and counterclaim Plaintiff Highland Capital Management, L.P. ("Highland") is the former investment manager of a series of funds collectively referred to as the "Crusader Funds."[6] The pending motions center on Highland's

---

[4] *See Willie Gary,* 906 A.2d at 79–81.
[5] *See* Dkt. No. 1 Ex. A. (the "Plan") § 9.03.
[6] Highland's Amended Counterclaim and Third-Party Complaint ("Am. Counterclaim") ¶ 1.

contractual rights to advancement of legal expenses from the Plaintiff and counterclaim Defendant Redeemer Committee of the Highland Crusader Fund (the "Committee") for pending litigation and arbitration. The underlying litigation arises from Highland's termination as the investment manager of the Crusader Funds. The Redeemer Committee commenced this action via a three-count complaint filed on July 5, 2016. The Committee's complaint sought a limited status quo order, a declaration that the Committee had "Cause" to terminate Highland as manager, and a declaration that Highland is not entitled to indemnification.[7] Contemporaneously with this litigation, the Committee filed a demand for arbitration.[8] Through its amended counterclaim, Highland is seeking declarations regarding its rights to advancement of legal fees for the pending litigation in this Court, as well as the pending AAA Arbitration.[9]

Highland also asserts claims for advancement against House Hanover, LLC ("House Hanover") and Alvarez & Marsal Holdings, LLC ("Alvarez & Marsal") via its counterclaim and third-party complaint.[10] Highland had managed the Crusader Funds from September 2000 until its termination on August 4, 2016.[11] Upon termination Highland transferred control of the Crusader Funds' assets to an affiliate

---

[7] *See id.* at ¶ 51.
[8] *See id.* at ¶ 57.
[9] *Id.* at Prayer for Relief. Highland also ultimately seeks indemnification.
[10] *See, e.g., id.* at ¶¶ 66–71.
[11] *See id.* at ¶¶ 1, 8.

of Alvarez & Marsal, the entity the Committee selected as the successor manager of the Crusader Funds.[12]  Similarly, Highland transferred to the Committee's designee, House Hanover, the general partnership interests which a Highland affiliate had held.[13]  Thus House Hanover and Alvarez & Marsal's involvement in this dispute arises from their new positions as general partner of certain funds and investment manager, respectively.  Through its seven-count counterclaim and third-party complaint "Highland seeks declarations regarding its advancement and indemnification rights" and "an injunction to preserve assets and to ensure that its advancement and indemnification rights are not rendered illusory by the Committee, House Hanover, and Alvarez & Marsal."[14]

### 1. The 2008 Financial Crisis

Highland served as the investment manager of several entities that together constitute the "Crusader Funds."[15]  Three funds—the "Feeder Funds"—fed into a "Master Fund."[16]  Each of the Crusader Funds was governed by its own documents—either a partnership agreement or "Bye-Laws" (the "Governing Documents").[17]  Trouble arose in 2008 when Highland provided notice to investors in all of the Feeder Funds that the funds would "wind-down," that is, they would be

---

[12] *Id.* at ¶ 5.
[13] *Id.*
[14] *Id.* at ¶ 7.
[15] Plan § 1.01.
[16] *Id.*
[17] *Id.*

liquidated, and that Highland would suspend redemption requests.[18] Certain investors were then forced to redeem their investments by Highland (the "Compulsory Redeemers").[19] Other investors had requested to redeem their interests in the Crusader Funds prior to Highland placing the funds into a "wind-down" (the "Prior Redeemers").[20] Disputes surrounding the "wind-down" between Highland and the two classes of Redeemers arose.[21]

2. The Plan[22]

Following several years of negotiation between Highland and investors in the Crusader Funds, an agreement was reached with a majority of the Prior Redeemers and the Compulsory Redeemers.[23] The "Consenting Redeemers,"[24] those agreeing to participate in the settlement, entered into a Joint Plan of Distribution of the Crusader Funds (the "Plan") in August 2011.[25] The Plan was adopted by the Crusader Funds, via the consent of the Consenting Redeemers and the "HCM-Related Parties," and "provid[ed] for the settlement and satisfaction of the claims of Consenting Redeemers."[26] HCM-Related Parties is a defined contractual term

---

[18] *See* Am. Counterclaim ¶ 2; Plan at Recital A.
[19] Am. Counterclaim ¶ 2; Plan § 1.01.
[20] *Id.*
[21] Am. Counterclaim ¶ 2; Plan at Recital B.
[22] *See* Am. Counterclaim ¶ 2 n.1 (citing and incorporating by reference the "Plan").
[23] *Id.* at ¶ 2.
[24] Plan § 1.01.
[25] Am. Counterclaim at ¶ 3.
[26] *See* Plan at Introduction.

6

meaning "[t]he Crusader Funds, the General Partner, and [Highland], as well as each of their present, future, and former respective officers, directors, employees, affiliates, agents and representatives."[27] The Plan retained Highland to continue managing the Crusader Funds.[28] Generally, the Plan governed how the Crusader Funds would be liquidated and ultimately distributed. The Plan created the "Redeemer Committee,"[29] and provided voting mechanisms for the selection of membership.[30] The Committee was given the authority to terminate Highland as investment manager "with or without Cause" upon thirty days' notice, along with various other powers in overseeing Highland's management of the "wind-down" under the Plan.[31]

The Plan contains a merger clause which provides in relevant part:

[t]his Plan constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof. Except as otherwise provided herein, this Plan supersedes all prior written and oral agreements, and no representations, warranties, statements, promises, or conditions not contained in this Plan shall be binding or have any force or effect whatsoever. In the event of a conflict between this Plan and any of the Governing Documents, the provisions of this Plan shall control. . . . The Governing Documents shall be deemed amended to conform to the provisions of the Plan . . . . [32]

---

[27] *Id.* at § 1.01.
[28] *Id.* at § 2.01.
[29] *See id.* at § 1.01.
[30] *Id.* at § 2.04.
[31] *Id.* at § 2.05(h); *See id.* at §§ 2.05, 2.06.
[32] *Id.* at § 9.05.

Further, Section 2.01 of the Plan provides that Highland's continued management of the Crusader Funds was subject "to the existing investment management agreements with the Crusader Funds, which will continue to apply except to the extent that their terms are inconsistent with the Plan. . . ."[33] The Plan is governed by New York law.[34] Further, the Plan provides for broad mutual releases of certain pre-Plan conduct.[35] Highland is subject to claims under the Plan, and asserts rights to indemnification and advancement. As discussed below, the Plan provides for arbitration of disputes between these parties.

## II. ANALYSIS

This matter requires that I answer the threshold question of who determines, in the first instance, whether the present dispute is subject to arbitration; that is, whether the Plan requires that the disputes as to substantive arbitrability first be presented to the arbitrator. The parties agree this is a procedural question governed by Delaware law.[36] This issue is jurisdictional; it must be answered at the outset because our law is well settled that "Delaware courts lack subject matter jurisdiction to resolve disputes that litigants have contractually agreed to arbitrate."[37]

---

[33] *Id.* at § 2.01.
[34] *Id.* at § 9.04.
[35] *See id.* at §§ 7.01, 7.02.
[36] *See* Oral Argument Tr. 7:15–23, 57:24–58:7.
[37] *See NAMA Holdings, LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 429 (Del. Ch. 2007).

## 1. *Applicable Principles*

The "general rule" is "courts should decide questions of substantive arbitrability."[38]  This general rule represent a default position that may be altered by contract.  To alter this default position, our Supreme Court found in *Willie Gary* that there must be "clear and unmistakable evidence" that the parties intended for substantive arbitrability be decided by an arbitrator.[39]  The *Willie Gary* test is satisfied, and clear and unmistakable evidence of the parties' intent to arbitrate arbitrability exists, where the pertinent contract contains "(1) an arbitration clause that generally provides for arbitration of all disputes; and (2) a reference to a set of arbitration rules that empower arbitrators to decide arbitrability, such as the American Arbitration Association ('AAA') Rules."[40]  A subsequent decision by this Court in *McLaughlin v. McCann*[41] recognized what later decisions have referred to as a third prong of the *Willie Gary* test:[42] the Court will not refer a frivolous issue of

---

[38] *Willie Gary*, 906 A.2d at 78.

[39] *See id.* at 79–81 (applying "clear and unmistakable" standard).

[40] *Legend Natural Gas II Holdings, LP v. Hargis*, 2012 WL 4481303, at *4 (Del. Ch. Sept. 28, 2012) (citing *Willie Gary*, 906 A.2d at 79).

[41] 942 A.2d 616 (Del. Ch. 2008).

[42] *See, e.g.*, *Riley v. Brocade Commc'ns Sys., Inc.*, 2014 WL 1813285, at *1 (Del. Ch. May 6, 2014) ("Not long thereafter, *Willie Gary's* test was expanded to include a third prong, which allowed the party seeking judicial relief to argue that the party seeking arbitration had essentially no non-frivolous argument about the substantive arbitrability of the dispute.") (citing *McLaughlin*, 942 A.2d at 626–27).  In fact, this is not a "prong" of the analysis under *Willie Gary*—which analysis is focused on contractual intent—it is simply a device to advance litigants' economy by avoiding reference of frivolous issues to arbitration. *See Angus v. Ajio, LLC,* 2016 WL 2894246, at *3 (Del. Ch. May 13, 2016) (explaining "[t]he reason for this third prong is clear: where it is readily apparent to the Court that all of the issues regarding substantive arbitrability are, on their face,

9

arbitrability to an arbitrator.[43]   However, "[w]hen a non-frivolous argument in favor

of substantive arbitrability exists and the first two prongs of *Willie Gary* are satisfied,

the Court should defer to the arbitrator."[44]

The Plan clearly provides that the AAA rules apply.[45]   Additionally, the

parties have not specifically raised the "third prong" and, in any event, I find upon a

cursory review that there is a non-frivolous argument that the dispute is subject to

arbitration.[46]   That dispute centers on a carve-out from the contractual requirement

that all disputes be decided by arbitration, reserving certain indemnification claims

for the Court; the issue is whether the parties meant to include advancement claims

in this carve-out.   Since a non-frivolous issue of arbitrability is present, and since the

parties explicitly chose arbitration under the AAA rules, I presume that, consistent

with those rules, arbitrability must be decided by the arbitrator.   Under *Willie Gary*,

---

clearly frivolous, it would be a waste of resources for the Court to send the claims to the arbitrator, notwithstanding their frivolousness, for consideration of arbitrability.").

[43] *Riley*, 2014 WL 1813285, at *1.

[44] *Id.*

[45] Plan § 9.03.

[46] *See 3850 & 3860 Colonial Blvd., LLC v. Griffin*, 2015 WL 894928, at *4 (Del. Ch. Feb. 26, 2015) ("The Court's analysis of whether there is any non-frivolous argument is limited—a court must not delve into the scope of the arbitration clause and the details of the contract and pending lawsuit.") (internal quotations omitted); *See also Li v. Standard Fiber, LLC*, 2013 WL 1286202, at *5 (Del. Ch. Mar. 28, 2013) ("Delaware courts have necessarily limited the preliminary evaluation step to determining whether there is no non-frivolous argument; otherwise a court would be deciding the first-order question of substantive arbitrability before deciding the second-order question of who decides substantive arbitrability.").

I must examine whether the arbitration clause applies "broadly," absent which the presumption may be rebutted.[47]

### 2. *The Plan's Terms and the Breadth of the "Carve-outs"*

I must determine whether the language set out below satisfies the first prong of *Willie Gary*. Section 2.09 of the Plan provides the following:

> In the event of *a dispute* between the Crusader Funds or the Redeemer Committee and [Highland,] any HCM-Related Party,[48] the General Partner or the Boards, . . . the applicable parties' representatives *shall* confer in good faith in an attempt to resolve the dispute within 48 hours of a request by either side. If they cannot reach a resolution through such good-faith effort, either side may engage the Mediator (with the expense to be shared 50% by the Crusader Funds and 50% by HCMLP) or, if he is unavailable, another mutually agreeable third party to mediate the dispute. If the dispute cannot be resolved by mediation it *will be* referred to arbitration in accordance with Section 9.03.[49]

Section 9.03 of the Plan provides, in relevant part, the following:

> *Any dispute* referred to in Sections 2.09, 5.03 or 6.02 above (other than a dispute regarding the existence of "Cause" or the payment or repayment in respect of Indemnification Obligations), which cannot be

---

[47] I note that the potential inefficiency of this inquiry has been addressed before by this Court. *See McLaughlin*, 942 A.2d at 623 (noting that our doctrine under *Willie Gary* "could be read to strip away the efficiency of interpreting a reference to the AAA Rules as a heuristic to avoid a deep inquiry into the parties' intent to arbitrate arbitrability"). The AAA rules are comprehensive arbitration rules that provide that questions of arbitrability are for the arbitrator. Where the parties have adopted such rules, and dispute a non-frivolous issue of arbitrability, it seems likely that they intended that issue to be arbitrated. A bright-line rule to such effect would serve litigants' economy and drafting efficiency. A further contextual analysis, such as required by the first prong of *Willie Gary*, is helpful only insofar as its utility in discovering the true intent of the parties outweighs the benefits of a bright-line rule. As *Willie Gary* is controlling precedent, I eschew that policy question here.

[48] A defined term meaning "[t]he Crusader Funds, the General Partner, and [Highland], as well as each of their present, future, and former respective officers, directors, employees, affiliates, agents and representatives." Plan § 1.01.

[49] Plan § 2.09 (emphasis added).

11

resolved through mediation referenced in Sections 2.09 or 5.03 or 6.02 above, respectively, *shall be subject to and decided by arbitration administered by the American Arbitration Association in accordance with the Commercial Arbitration Rules*, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof pursuant to applicable law.[50]

Highland argues that the parenthetical clause in the language above contains an "expansive carve-out" and that "[b]ecause the Plan provides for arbitration of some but not all claims and because the Plan contains no clear and unmistakable evidence of the parties' intent to arbitrate arbitrability, the Court must decide the gateway issue of substantive arbitrability."[51] The Committee notes that the provisions generally provide for arbitration of *all* disputes, *unless* they fall within the "limited exceptions."[52] Further the Committee asserts the carve-outs are sufficiently "narrow" to satisfy the first prong of *Willie Gary*.[53]

Application of the first prong pursuant to the text of the *Willie Gary* decision alone has been characterized by this Court as "less than clear,"[54] particularly in light of the fact that the parties have adopted rules that explicitly refer substantive arbitrability to the arbitrator. Later decisions have sought to phrase the first prong into a more workable standard and have grappled with the meaning of "generally

---

[50] *Id.* at § 9.03 (emphasis added).
[51] *See* Dkt. No. 99, Highland's Oct. 17, 2016 Br. 21–22.
[52] Dkt. No. 111, Committee's Oct. 31, 2016 Br. 13.
[53] Dkt. No. 83, Committee's Sept. 19, 2016 Br. 25.
[54] *See McLaughlin*, 942 A.2d at 623.

12

provides for arbitration of all disputes."[55]  In *McLaughlin*, then Vice Chancellor, now Chief Justice, Strine summarized his understanding of the test as follows:

> What I take away from the 'generally provides for arbitration of all disputes' requirement is that the carveouts and exceptions to committing disputes to arbitration should not be *so obviously broad and substantial* as to overcome a heavy presumption that the parties agreed by referencing the AAA Rules and deciding to use AAA arbitration to resolve a wide range of disputes that the arbitrator, and not a court, would resolve disputes about substantive arbitrability.  *In a case where there is any rational basis for doubt about that, the court should defer to arbitration, leaving the arbitrator to determine what is or is not before her*.  By this approach, this court can achieve the efficiency contemplated by the Supreme Court's *Willie Gary* decision.[56]

Other decisions by our Court have adopted this approach, as I do here.[57]  Where, as here, the parties have adopted the AAA rules, carving out some obligations from an otherwise broad arbitration provision, alone, will not result in a failure of the first prong of *Willie Gary*.[58]

Under Section 2.09 of the Plan, if "a dispute" arises between the Redeemer Committee and Highland, or various other people or entities, and if "the dispute cannot be resolved by mediation it will be referred to arbitration in accordance with

---

[55] *See, e.g.*, *id.* at 623–24.

[56] *Id.* at 625 (citations omitted).

[57] *See Carder v. Carl M. Freeman Communities, LLC*, 2009 WL 106510, at *6 (Del. Ch. Jan. 5, 2009) (quoting extensively from *McLaughlin* and concluding "I concur with the understanding of the *Willie Gary* test reflected in the *McLaughlin* case, and follow that approach here"); *Greenstar IH Rep, LLC v. Tutor Perini Corp.*, C.A. No. 12885-VCS, at 11–14 (Del. Ch. Feb. 23, 2017) (same).

[58] *See State v. Corr. Officers Ass'n of Delaware*, 2016 WL 6819733, at *6 (Del. Ch. Nov. 18, 2016) ("Delaware courts have repeatedly rejected the Department's argument that, if an arbitration provision contains any exceptions, then the parties did not intend to empower the arbitrator to determine substantive arbitrability for all other contractual claims.").

Section 9.03."[59]  Section 9.03 provides that "[*a*]*ny dispute* referred to in Section 2.09 . . . (other than a dispute regarding the existence of "Cause" or the payment or repayment in respect of Indemnification Obligations) . . . *shall be* subject to and decided by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules . . . ."[60]

On its face, this is a broad arbitration provision which generally provides for arbitration of all disputes. Read together, Sections 2.09 and 9.03 of the Plan provide that *any* dispute, subject to two carve-outs, between Highland the Committee and various other entities shall be subject to arbitration pursuant to rules which provide that the arbitrator decides substantive arbitrability. The question becomes whether the carve-outs present here are so expansive as to overcome the presumption in favor of arbitration of arbitrability raised by the parties' adoption of the AAA rules.[61]  I find that the exceptions to arbitration here are not so expansive.

The Plan constituted a compromise reached between a majority of investors in the Crusader Funds and Highland and its affiliates.[62]  The Plan contains broad releases by both the Consenting Redeemers and Highland of certain pre-Plan disputes.[63]  Further, the Plan provides the terms for the management of the Crusader

---

[59] Plan § 2.09.
[60] *Id.* at § 9.03 (emphasis added).
[61] *See McLaughlin*, 942 A.2d at 625.
[62] *See, e.g.*, Dkt. No. 99, Highland's Oct. 17, 2016 Br. 5 (characterizing the Plan as a "negotiated settlement").
[63] *See* Plan §§ 7.01, 7.02.

14

Funds going forward, including allowing Highland to continue managing the Funds along with the creation of the Redeemer Committee and its corresponding powers to oversee Highland.[64] To accommodate such changes, the Plan specifies that it modifies prior agreements to conform with its terms.[65] Additionally, the Plan provides the terms governing how the Funds are to be liquidated,[66] and how distributions are to be allocated among classes of Redeemers.[67] Finally, existing relations among the parties were preserved as provided in pre-existing agreements, to the extent they were not inconsistent with the Plan.[68]

A cursory reading of the Plan illustrates the various disputes that could arise under its terms, including, for example: whether the Redeemer Committee has improperly withheld its consent to an action,[69] the proper calculation of a Consenting Redeemer's "Redemption Amount,"[70] the Redeemer Committee's access to a Fund's books and records,[71] disputes between the Committee and Highland or its affiliates regarding the correct interpretation of the Plan—including the extent to which the Plan supersedes a Governing Document[72] or an existing investment management

---

[64] *See id.* at §§ 2.01, 2.04, 2.05.
[65] *See id.* at §§ 2.01, 9.05.
[66] *See, e.g., id.* at §§ 2.01, 2.04, Ex. B.
[67] *See id.* at § 4.01.
[68] *See id.* at §§ 2.01, 9.05.
[69] *See id.* at § 2.07 ("The approval of the Redeemer Committee with respect to any matter submitted for approval under Sections 2.05 or 2.06 shall not be unreasonably withheld.").
[70] *Id.* at §§ 5.03, 9.03.
[71] *Id.* at § 2.05(a).
[72] *See id.* at §§ 2.09, 9.05.

agreement,[73] and whether a particular dispute was released by the Plan.[74] This non-exhaustive list makes it apparent that a broad variety of disputes may arise here, subject to arbitration.[75]

The Plan refers all disputes that may arise between Highland and the other parties to arbitration, except for disputes concerning "Cause" and "Indemnification Obligations."[76] Each carve-out is a contractually defined term.[77] "Cause" relates to the Committee's ability to terminate Highland "for cause," upon a failure of the Funds to comply with a distribution schedule for two consecutive quarters, the Funds' engaging in unauthorized transactions, or if Highland is determined to have engaged in fraud or willful misconduct by a court of competent jurisdiction.[78] I note that the Plan permitted Highland to be terminated, with or without Cause—thus only certain terminations of Highland—a category itself involving only a narrow subset of the potential (and otherwise arbitrable) disputes among these parties—would involve "Cause."[79]

---

[73] *See id.* at §§ 2.09, 2.01, 9.05.
[74] *See, e.g.*, *id.* at § 7.02.
[75] I note Highland itself has argued earlier in this litigation that the carve-outs are "narrow." *See* Dkt. No. 38, Highland's July 22, 2016, Opening Br. in Support of its Motion to Dismiss or Stay at 18 ("Here, Section 9.3 of the Plan demonstrates the clear intent of the parties that arbitration would be the primary forum for resolving '[a]ny dispute referred to in Sections 2.09 [and] 6.02,' with only a narrow carve-out.").
[76] *See* Plan § 9.03.
[77] *See id.* at § 1.01.
[78] *See id.*
[79] *See id.* at § 2.05(h).

I turn to the "Indemnification Obligations" carve-out. This exception to broad arbitrability is also narrow; it leaves to arbitration most substantive disputes on which indemnification will turn. Given the universe of potential conflicts arising under the Plan, I find this carve-out insufficiently broad to overcome the presumption created by the clear statement that *any dispute* is to be arbitrated pursuant to the AAA rules. To my mind, even read together these two carve-outs do not amount to such a substantial exception to general arbitrability as to indicate that the parties meant to eschew the AAA rules on substantive arbitrability.[80]

Both sides here cite to case law as supportive of their positions.[81] The contextual nature of the inquiry required under *Willie Gary* makes factual analysis of other actions largely unhelpful, in my view. Highland, for its part, argues the carve-outs here are similar to those in *Milton Investments, LLC v. Lockwood Brothers, II, LLC*,[82] and *Israel Discount Bank of New York v. First State Depository Co., LLC*,[83] and that these decisions should persuade me to find that the carve-outs here defeat the first prong of *Willie Gary*.[84] The agreement in *Milton Investments*, however, provided that four specified categories of disputes be sent to arbitration,

---

[80] *See McLaughlin*, 942 A.2d at 623–26.
[81] *See*, *e.g.*, Dkt. No. 83, Committee's Sept. 19, 2016 Br. 25; Dkt. No. 111, Committee's Oct. 31, 2016 Br. 13 (citing to *W. IP Commc'ns, Inc. v. Xactly Corp.*, 2014 WL 3032270, at *1 (Del. Super. Ct. June 25, 2014)); Dkt. No. 99, Highland's Oct. 17, 2016 Br. 23–24.
[82] 2010 WL 2836404 (Del. Ch. July 20, 2010).
[83] 2012 WL 4459802 (Del. Ch. Sept. 27, 2012), *aff'd*, 86 A.3d 1118 (Del. 2014).
[84] Dkt. No. 99, Highland's Oct. 17, 2016 Br. 23–24.

and then provided an overlay of two carve-outs; I find the case unhelpful in the context of the broad arbitration provision before me here.[85] Similarly, the governing language in *Israel Discount Bank* provided a carve out for all "interpleader suits."[86] The Court found in the context of that particular agreement that the carve-out was not narrow and noted that, under the contractual language there, the permission to seek judicial relief via interpleader actions was "especially relevant" due to the nature of disputes which could arise under the contract.[87] In other words, I find the facts of neither case apt here, and thus the holding in those cases not instructive.

The issue of arbitrability presented here is non-frivolous, and the parties bound themselves to arbitration, broadly, of issues among them; they adopted the AAA rules which provide that the arbitrator must determine arbitrability. Therefore, this action is stayed pending a decision on that issue by the arbitrator.

Counsel should provide an appropriate form of order.

Sincerely,

*/s/ Sam Glasscock III*

Sam Glasscock III

---

[85] *See Milton Investments*, 2010 WL 2836404, at *2, 6–7.
[86] *Israel Discount Bank*, 2012 WL 4459802, at *5.
[87] *Id.*

18