# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| UPM-KYMMENE CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | C.A. No. 2017-0363-AGB |
| | ) | |
| | ) | |
| RENMATIX, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: July 26, 2017
Date Decided:  October 6, 2017

Thomas C. Grimm, John P. DiTomo, and Stephen J. Kraftschik, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Abigail T. Reardon, NIXON PEABODY LLP, New York, New York; Daniel J. Burnham and Laura B. Bacon, NIXON PEABODY LLP, Chicago, Illinois, *Attorneys for Plaintiff*.

David J. Margules, Justin M. Miller, Evan W. Krick, and William J. Burton, BALLARD SPAHR LLP, Wilmington, Delaware; Richard W. Miller, BALLARD SPAHR LLP, Atlanta, Georgia, *Attorneys for Defendants*.

**BOUCHARD, C.**

In 2013, UPM-Kymmene Corporation and Renmatix, Inc. entered into two agreements to explore potential collaborations involving certain technology Renmatix had developed. The first agreement calls for all of their disputes to be arbitrated before the International Chamber of Commerce ("ICC"). The second agreement, which was entered into six months later and includes an additional signatory, calls for disputes arising pursuant to that agreement to be arbitrated before the American Arbitration Association ("AAA").

In April 2017, Renmatix filed an arbitration demand against UPM before the AAA. The prayer for relief in the demand generally references the parties' "multiple agreements" but the body of the demand more specifically asserts claims under the second agreement. In May 2017, UPM filed this action seeking declaratory and injunctive relief to prevent Renmatix from arbitrating its claims before the AAA or any forum other than the ICC. The parties have filed cross-motions, with Renmatix seeking to dismiss the complaint for lack of subject matter jurisdiction due to the availability of an adequate remedy at law in the form of arbitration before the AAA, and UPM seeking entry of summary judgment in its favor.

For the reasons explained below, I conclude based on the application of ordinary principles of contract law that the claims Renmatix purports to assert before the AAA properly belong there. Accordingly, Renmatix's motion to dismiss will be granted and UPM's motion for summary judgment will be denied.

1

## I. BACKGROUND

Unless noted otherwise, the facts recited in this opinion are based on the allegations of the Verified Complaint and the documents attached thereto.

### A. The Parties

Plaintiff UPM-Kymmene Corporation ("UPM") is a Finnish company involved in the development and commercialization of renewable resources. Defendant Renmatix, Inc. is a biotechnology startup incorporated in Delaware and headquartered in Pennsylvania. It developed a process to produce sugars for the global renewable chemical and fuel markets, which it calls the Plantrose process.

### B. The Bi-Lateral Agreement

On March 16, 2012, Renmatix and UPM entered into a Confidentiality Agreement to allow them to "engage in discussions with respect to a potential cooperation regarding . . . [Renmatix's] proprietary technology."[1] On April 26, 2012, they entered into a Material Transfer Agreement providing for an exchange of sample material. On May 16, 2013, Renmatix and UPM entered into a Joint Development Agreement ("Bi-Lateral Agreement"), which references and attaches the Confidentiality and Material Transfer Agreements they previously entered.

Under the Bi-Lateral Agreement, Renmatix and UPM agreed to develop a plan for the broader commercialization of Renmatix's Plantrose process. The Bi-

---

[1] Compl., Ex. B at App. 5.

2

Lateral Agreement contains an arbitration clause requiring arbitration of "all disputes, controversies or claims" between the parties before the International Chamber of Commerce following a period of good faith negotiations:

> This Agreement, including the [Confidentiality Agreement] and the [Material Transfer Agreement], shall be governed by and construed in accordance with the laws of England. The Parties agree to negotiate all disputes, controversies or claims (including breach, termination or validity of this Agreement) between them in good faith for a period of 30 days following written notice of such dispute. If the Parties fail to resolve such dispute during this negotiation period, then such dispute shall be finally settled by binding arbitration in accordance with the Rules of Arbitration of the International Chamber of Commerce. The language of the arbitration proceedings shall be English and the venue of the proceedings shall be in Toronto, Canada.[2]

## C. The Tri-Lateral Agreement

In addition to UPM, Renmatix's technology attracted the interest of non-party BASF SE ("BASF"). On November 20, 2013, Renmatix, UPM, and BASF entered into a Joint Development Agreement ("Tri-Lateral Agreement"). The stated purpose of the Tri-Lateral Agreement was "to improve process steps of the Plantrose process."[3] The Tri-Lateral Agreement references and attaches as appendices (1) the Material Transfer Agreement between Renmatix and UPM, (2) a second Material Transfer Agreement dated August 15, 2011, as amended February 1, 2012, between

---

[2] Compl., Ex. B § 17.

[3] Compl., Ex. C § 1.1.

BASF and Renmatix, and (3) a Confidentiality Agreement dated January 25, 2013, among UPM, BASF, and Renmatix.[4]

The Tri-Lateral Agreement requires the parties to arbitrate "any dispute, claim or controversy arising pursuant to this Agreement" in an arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules following a period for settlement discussions:

> The Parties agree that any dispute, claim or controversy arising pursuant to this Agreement, or the rights or obligations of the Parties hereunder shall be resolved solely by application of the procedures set forth in this Section 9.11.
> . . .
> If such representatives are unable to resolve such dispute within fifteen (15) business days following the first settlement meeting or call between the executives, any Party may demand arbitration by sending written notice to the other Parties. Such arbitration shall be administered by the American Arbitration Association ("AAA") in accordance with its Commercial Arbitration Rules. The arbitration proceedings shall be conducted before one arbitrator in Wilmington, Delaware or any other place selected by mutual agreement of the Parties. The arbitrator shall apply the governing law [of the State of Delaware].[5]

**D.  The Arbitration Demand**

On April 24, 2017, Renmatix served UPM with a Demand for Arbitration it filed with the AAA (the "Demand") pursuant to the arbitration provision in the Tri-

---

[4] Compl., Ex. C at App. 4, 5.

[5] Compl., Ex. C § 9.11.

Lateral Agreement, which is quoted in the Demand.[6]  Although the Demand is not a model of clarity, it becomes clear when read carefully that the Demand purports to assert claims under the Tri-Lateral Agreement.

Page 1 of the Demand refers to the "Joint Development Agreement" attached thereto as Exhibit A.[7]  That term is defined to refer specifically to the Tri-Lateral Agreement.[8]  Most significantly, the Demand cites to Sections 2.2(a) and 2.2(e) of the Tri-Lateral Agreement as the basis for Renmatix's claims.[9]

Section 2.2(a) of the Tri-Lateral Agreement provides, in relevant part, that "Renmatix shall be the sole owner of any Invention generated from the efforts of the Parties in the course of performing activities under the Joint Project Plan that relates to," among other things, the Plantrose process.[10]  Section 2.2(e) provides, in relevant part, that "[e]ach Party shall promptly disclose to the other Parties all Inventions developed by it" and that "[t]he Party owning the Invention shall have the exclusive right to apply (or to choose not to apply) for or register any patents, and such other

---

[6] Compl., Ex. A at 9.

[7] Compl., Ex. A at 1.

[8] Compl., Ex. A at 8.  The defined term used on this page (*i.e.*, "Joint Defense Agreement") is an obvious typographical error.  The intended reference was "Joint Development Agreement."

[9] Compl., Ex. A at 13 (citing pages 7-8 of the Tri-Lateral Agreement) and 14 (citing pages 8-9 of the Tri-Lateral Agreement).

[10] Compl., Ex. C § 2.2(a).

proprietary protections anywhere in the world, with respect to such Invention."[11]

Renmatix alleges in the Demand that UPM violated these provisions by filing "at least five patent applications directed to Renmatix's technology that the parties agreed would be owned by Renmatix."[12] Four of these patents were filed after the Tri-Lateral Agreement was signed.[13]

The Bi-Lateral Agreement between Renmatix and UPM as well as the Confidentiality and Material Transfer Agreements that are referenced in the Bi-Lateral Agreement are discussed in the background section of the Demand.[14] No claims are asserted in the Demand, however, under any specific provision of the Bi-Lateral Agreement.

### E. Procedural History

On May 10, 2017, UPM filed this action seeking declaratory and injunctive relief to prevent Renmatix from arbitrating its claims before the AAA or any forum other than the ICC in Toronto, Canada under the Bi-Lateral Agreement.

On June 1, 2017, Renmatix moved to dismiss the complaint under Court of Chancery Rule 12(b)(1) for lack of subject matter jurisdiction based on the existence of an adequate remedy at law in the form of arbitration, which Renmatix contends

---

[11] Compl., C § 2.2(e).

[12] Compl., Ex. A at 17.

[13] *See* Compl., Ex. A at 19, 21.

[14] *See* Compl., Ex. A at 9-11.

must proceed before the AAA under the Tri-Lateral Agreement.  On June 28, 2017, UPM cross-moved for summary judgment on its claims under Court of Chancery Rule 56.

The Court heard argument on both motions on July, 26, 2017.  On October 3, 2017, the Court approved a stipulation between the parties setting forth certain interim arrangements between them until the Court decides the present motions.

## II.   ANALYSIS

"In considering a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, the court must address the nature of the wrong alleged and the remedy sought to determine whether a legal, as opposed to an equitable, remedy is available and adequate."[15]   "If a claim is arbitrable, *i.e.,* properly committed to arbitration, this Court lacks subject matter jurisdiction because arbitration provides an adequate legal remedy."[16]

Under Rule 56, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[17]

---

[15] *Julian v. Julian*, 2009 WL 2937121, at *3 (Del. Ch. Sept. 9, 2009).

[16] *Id.*

[17] Del. Ch. Ct. R. 56.

### A.  The Standard for Determining Substantive Arbitrability

Because the Tri-Lateral Agreement involves interstate commerce and is not subject to the Delaware Uniform Arbitration Act,[18] the Federal Arbitration Act ("FAA") governs.[19]  In a case involving an arbitration governed by the FAA, the United States Supreme Court explained that, "[w]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."[20]

A disagreement about the scope of an arbitration provision—such as whether an arbitration provision governs a particular dispute—is known as an issue of "substantive arbitrability."[21]  A recurring area of controversy in our case law is whether a court or an arbitrator should decide questions of substantive arbitrability.

---

[18] Section 5702(c) of the Delaware Uniform Arbitration Act provides that "any application to the Court of Chancery to enjoin or stay an arbitration [or to] obtain an order requiring arbitration . . . shall be decided by the Court of Chancery in conformity with the Federal Arbitration Act and such principles of law and equity as are not inconsistent with that Act" unless the "arbitration agreement complies with the standard set forth in subsection (a) of this section for the applicability of the Delaware Uniform Arbitration Act."  10 *Del. C.* § 5702(c).  The standard set forth in subsection (a) requires "specifically referencing the Delaware Uniform Arbitration Act and the parties' desire to have it apply to their agreement."  10 *Del. C.* § 5702(a).  *See Lewis v. AimCo Properties, L.P.*, 2015 WL 557995, at *3 n.9 (Del. Ch. Feb. 10, 2015).  The Tri-Lateral Agreement does not satisfy this requirement.

[19] *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 80 (Del. 2006) (citing *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 273-74 (1995)); *McLaughlin v. McCann*, 942 A. 2d 616, 621 (Del. Ch. 2008).

[20] *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

[21] *Willie Gary*, 906 A.2d at 78; *see also Legend Nat. Gas II Holdings, LP v. Hargis*, 2012 WL 4481303, at *4 (Del. Ch. Sept. 28, 2012) ("Substantive arbitrability involves, among

In accordance with United States Supreme Court authority, Delaware law follows the general rule that "courts should decide questions of substantive arbitrability."[22] In recognition of the fact that arbitration rights ultimately are a creature of contract, however, the general rule contains a significant exception "when there is 'clear and unmistakable evidence' that the parties intended otherwise."[23]

In *James & Jackson, LLC v. Willie Gary, LLC*, our Supreme Court articulated a two-prong test for determining when there is clear and unmistakable evidence that the parties intended to have an arbitrator (rather than the Court) decide questions of substantive arbitrability, namely when an arbitration clause: (1) "generally provides for arbitration of all disputes;" and (2) "incorporates a set of arbitration rules that empower[s] arbitrators to decide arbitrability."[24]

In *McLaughlin v. McCann*, then-Vice Chancellor Strine, who found the "generally provides for arbitration of all disputes" requirement in the *Willie Gary* test to be "less than clear," explained that this requirement logically means that:

> . . . the carveouts and exceptions to committing disputes to arbitration should not be so obviously broad and substantial as to overcome a heavy presumption that the parties agreed by referencing the AAA

---

other things, the applicability of an arbitration clause, the scope of an arbitration provision, and whether the arbitration clause is valid and enforceable.").

[22] *Willie Gary,* 906 A.2d at 78.

[23] *Id.* at 79 (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)).

[24] *Id.* at 80.

Rules and deciding to use AAA arbitration to resolve a wide range of disputes that the arbitrator, and not a court, would resolve disputes about substantive arbitrability.[25]

He further explained that, in "a case where there is any rational basis for doubt about that, the court should defer to arbitration, leaving the arbitrator to determine what is or is not before her."[26]  Consistent with this policy of deference to the arbitrator, then-Vice Chancellor Strine articulated what has become an additional inquiry to guard against the frivolous invocation of an arbitration clause even when the *Willie Gary* test has been satisfied:

> . . . absent a clear showing that the party desiring arbitration has essentially no non-frivolous argument about substantive arbitrability to make before the arbitrator, the court should require the signatory to address its arguments against arbitrability to the arbitrator.[27]

This additional "step was added to avoid situations in which the *Willie Gary* test is technically satisfied but there is no non-frivolous argument that the arbitration clause covers the underlying dispute."[28]  In other words, removing the double negative, this additional step was added to avoid a situation where the only

---

[25] *McLaughlin*, 942 A.2d at 623, 625.

[26] *Id.*

[27] *Id.* at 626-27.

[28] *Li v. Standard Fiber, LLC*, 2013 WL 1286202, at *5 (Del. Ch. Mar. 28, 2013); *see also Legend Nat. Gas*, 2012 4481303, at *6 ("Under *McLaughlin* and its progeny, once the two prongs of *Willie Gary* have been met, a court must make a preliminary evaluation of whether the party seeking to avoid arbitration of arbitrability has made a clear showing that its adversary has made essentially no non-frivolous argument about substantive arbitrability.") (internal quotation omitted).

basis for one to invoke an arbitration clause is frivolous even though the two prongs of the *Willie Gary* test technically are satisfied. Since *McLaughlin* was decided, this Court routinely has applied the *Willie Gary/McLaughlin* framework to decide who should resolve issues of substantive arbitrability.[29]

## B. The Parties' Contentions

Renmatix argues that the Tri-Lateral Agreement satisfies the *Willie Gary* test because its arbitration clause covers all disputes relating to that agreement and because the Tri-Lateral Agreement evokes a clear intent to refer questions of arbitrability to the arbitrator by incorporating the AAA Commercial Arbitration Rules. Thus, according to Renmatix, the AAA arbitrator should decide any issues of substantive arbitrability arising from the Demand. In making this argument, Renmatix represented to the Court that its Demand was intended to assert claims only under the Tri-Lateral Agreement and *not* under the Bi-Lateral Agreement.[30]

UPM is suspicious of Renmatix's intentions. UPM contends that the Tri-Lateral Agreement is an agreement among three parties—Renmatix, UPM, and BASF—and does not create obligations that Renmatix can enforce against UPM

---

[29] *See, e.g. GreenStar IH Rep, LLC v. Tutor Perini Corp.*, 2017 WL 715922, at *6 (Del. Ch. Feb. 23, 2017); *Angus v. Ajio, LLC*, 2016 WL 2894246, at *1 (Del. Ch. May 13, 2016); *3850 & 3860 Colonial Blvd., LLC*, 2015 WL 894928, at *7 (Del. Ch. Feb. 26, 2015); *Li v. Standard Fiber*, LLC, 2013 WL 1286202, at *5 (Del. Ch. Mar. 28, 2013); *Legend Nat. Gas*, 2012 WL 4481303, at *6; *Carder v. Carl M. Freeman Communities, LLC*, 2009 WL 106510, at *7 (Del. Ch. Jan. 5, 2009).

[30] Tr. 61-62.

11

alone.  According to UPM, Renmatix is trying to use AAA arbitration improperly to press claims against UPM under the Bi-Lateral Agreement that must be arbitrated before the ICC.  In support of this contention, UPM points out that Renmatix's request for relief in the Demand asserts that UPM's actions breached "multiple agreements" between UPM and Renmatix.  UPM argues that the *Willie Gary* test does not apply here and that the Court's task is to determine which of the two arbitration provisions at issue governs the parties' dispute through the application of ordinary principles of contract construction.

## C.     What Framework Should Apply to the Pending Motions?

Despite this Court's substantial jurisprudence interpreting and applying the *Willie Gary* test for more than a decade, including in the face of conflicting contractual provisions concerning the appropriate forum in which a dispute should be decided,[31] the issue before the Court appears novel.  The unusual feature of this case is that UPM and Renmatix are parties to two agreements with conflicting arbitration provisions:  the Bi-Lateral Agreement provides for arbitration before the ICC of "all disputes, controversies or claims" between UPM and Renmatix, while

---

[31] *See, e.g. GreenStar*, 2017 WL 715922, at *1  (applying the *Willie Gary/McLaughlin* framework where "one contract, an employment agreement, contain[ed] a mandatory arbitration clause; the other contract, a merger agreement, provide[d] that all disputes arising under that agreement shall be adjudicated by a Delaware court"); *3850 & 3860 Colonial Blvd., LLC*, 2015 WL 894928, at *1 (applying the *Willie Gary/McLaughlin* where "the company's operating agreement provides for arbitration (following mediation); the successor corporation's charter calls for litigation in this Court").

12

the second-in-time Tri-Lateral Agreement provides for arbitration before the AAA of "any dispute, claim or controversy arising pursuant to" the Tri-Lateral Agreement.

The obvious challenge in Renmatix's position that the pending motions should be decided by applying the *Willie Gary* test is that the arbitration clause in the Tri-Lateral Agreement does not generally provide for arbitration of "all disputes" between Renmatix and UPM because they are signatories to two agreements with conflicting arbitration provisions. Neither party has identified any Delaware authority applying *Willie Gary* in the face of two conflicting arbitration provisions.

In support of its position that the pending motions should be decided by applying ordinary principles of contract law and not by applying the *Willie Gary* test, UPM relies on this Court's decisions in *Hough Associates, Inc. v. Hill,*[32] *TowerHill Wealth Management, LLC v. Bander Family Partnership, L.P.,*[33] and *3850 & 3860 Colonial Blvd., LLC v. Griffin,*[34] and numerous non-Delaware authorities.[35] I discuss the three Delaware decisions next.

---

[32] 2007 WL 148751 (Del. Ch. Jan. 17, 2007).

[33] 2008 WL 4615865 (Del. Ch. Oct. 9, 2008).

[34] 2015 WL 894928.

[35] *See, e.g. Infrassure, Ltd. v. First Mutual Transp. Assurance Co*., 842 F.3d 174, 175 (2d Cir. 2016) (holding that, based on the contract language, an arbitration clause in the body of a reinsurance certificate controlled and was not displaced by an endorsement); *Applied Energetics, Inc. v. NewOak Capital Markets, LLC*, 645 F.3d 522, 525 (2d Cir. 2011) (holding that, based on the contract language, an adjudication clause in a placement agreement controlled, even though an earlier engagement agreement provided for mandatory arbitration); *Bradford-Scott Data Corp., Inc. v. Physician Computer Network,*

In *Hough Associates*, Michael Hill sought to compel arbitration of claims asserted against him under a non-competition agreement based on an arbitration provision contained in a separate stock purchase agreement. Finding that the non-competition and stock purchase agreements "function independently and contain their own terms designed to satisfy their own unique objectives," then-Vice Chancellor Strine denied Hill's motion to compel arbitration without applying the *Willie Gary* test.[36] He reasoned that all of the substantive claims in the case arose from the non-competition agreement, which did not even mention arbitration, and thus there was "no basis to find that the parties agreed to arbitrate any claims stemming from their" non-competition agreement.[37]

In *TowerHill*, then-Vice Chancellor Strine refused to certify an interlocutory appeal of an order he entered after a bench ruling in which he granted TowerHill's motion to preliminary enjoin an arbitration initiated against it. Similar to what occurred in *Hough Associates*, the party that initiated the arbitration did so under one contract (an investment advisory agreement) even though its claims arose under a series of different contracts (operating agreements for various investment LLCs),

---

*Inc.*, 136 F.3d 1156, 1158 (7th Cir. 1998) (holding that, based on the contract language, the arbitration clause in the 1993 Agreement controlled and defeated defendants' demand for arbitration under the 1998 Agreement).

[36] *Hough Associates*, 2007 WL 148751, at *6.

[37] *Id.* at *2, 6.

"which call for *binding* dispute resolution to take place *in this court*, not in arbitration."[38]   Given this disconnect, the Court understandably determined that *Willie Gary* did not apply and that the task of deciding issues of substantive arbitrability fell to the Court.[39]

*Colonial Blvd.* involved two competing dispute resolution provisions:  one in an LLC operating agreement providing for arbitration of "any dispute arising under or relating to" that agreement, and a second in the charter of a successor corporation designating the Court of Chancery as the exclusive forum for resolving certain corporate disputes.  One of plaintiff's arguments was that the charter provision "superseded the earlier adopted, conflicting" provision in the LLC agreement as a matter of contract law.[40]   The Court applied ordinary principles of contract construction to decide this threshold issue, concluding based "on a plain reading of the agreements" that it could not find that the dispute resolution provision in the charter superseded the one in the LLC agreement "with respect to the resolution of disputes related to the recapitalization."[41]  In doing so, the Court was careful to note that it was drawing "this conclusion generally" and was not deciding "whether all of the allegations fall within the scope of the LLC Provision," leaving those issues for

---

[38] *TowerHill*, 2008 WL 4615865, at \*3. (emphasis in original).

[39] *TowerHill*, C.A. No 3830, at 38-39 (Del. Ch. Aug. 22, 2008) (TRANSCRIPT).

[40] *Colonial Blvd.,* 2015 WL 894928, at \*3.

[41] *Id.* at \*5.

the "arbitrator to decide."[42]  After determining that "the parties have an enforceable agreement to arbitrate," the Court went on to apply the *Willie Gary/McLaughlin* framework to adjudicate defendants' motion to dismiss for lack of subject matter jurisdiction.[43]

What I take away from these decisions, each of which involved multiple contracts defining the parties' relationships, is that the *Willie Gary* test should be applied with particular caution and not reflexively in the multiple-contract scenario. In *Hough Associates* and *TowerHill*, the Court quickly discerned the absence of a clear and unmistakable intention to have an arbitrator decide issues of substantive arbitrability when the contract containing the arbitration clause was in obvious tension with the contract(s) that formed the basis of the claims.  In *Colonial Blvd.*, the Court sensibly applied ordinary principles of contract construction to determine as a threshold matter whether or not the agreement containing the arbitration clause was legally enforceable.

These cases serve as a reminder of the cardinal principle that arbitration rights ultimately are creatures of contract and that courts are responsible for deciding questions of substantive arbitrability *unless* there is clear and unmistakable evidence that the parties intended otherwise.  As our Chief Justice, then a Vice Chancellor,

---

[42] *Id.* at *5 n. 53.

[43] *Id.* at *5-8.

stated in *Hough Associates*, "courts should err on the side of enforcing arbitration when the issue of arbitrability is a close one, but should be wary that the 'policy that favors alternative dispute resolution mechanisms, such as arbitration, does not trump basic notions of contract interpretation.'"[44]

Here, the core dispute between the parties is not whether the claims in Renmatix's Demand should be arbitrated or litigated in court—the parties agree that the claims must go to arbitration—but whether those claims must be arbitrated before the ICC or AAA. Each of the agreements at issue, moreover, incorporates a set of arbitration rules empowering the arbitrator to decide arbitrability, albeit a different arbitrator.[45] In the face of such dueling arbitration clauses, I cannot discern

---

[44] 2007 WL 148751, at *13 (quoting *Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 156 (Del. 2002)).

[45] AAA Commercial Arbitration Rule R-7(a) gives the arbitrator "the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." AAA Commercial Arbitration Rule R-7(a), *available at* https://www.adr.org/sites/default/files/Commercial%20Rules.pdf. Similarly, ICC Arbitration Rule 6(3) provides that "if any party raises one or more pleas concerning the existence, validity or scope of the arbitration agreement or concerning whether all of the claims made in the arbitration may be determined together in a single arbitration, the arbitration shall proceed and any question of jurisdiction or of whether the claims may be determined together in that arbitration shall be decided directly by the arbitral tribunal, unless the Secretary General refers the matter to the Court for its decision pursuant to Article 6(4)." ICC Rule of Arbitration Article 6(d), available at https://iccwbo.org/dispute-resolution-services/arbitration/rules-of-arbitration/.

17

an intention, much less a clear and unmistakable intention, that the parties wished to have one arbitrator rather than the other determine where the claims asserted in the Demand should be arbitrated. Accordingly, it falls to the Court to decide that issue.

### D. Renmatix May Enforce the Tri-Lateral Agreement Against UPM

The Tri-Lateral Agreement is governed by Delaware law,[46] which requires courts to give unambiguous contract terms their plain meaning without regard to extrinsic evidence.[47] Delaware courts "read a contract as a whole and . . . give each provision and term effect, so as not to render any part of the contract mere surplusage."[48] "Delaware law adheres to the objective theory of contracts, *i.e.*, a contract's construction should be that which would be understood by an objective, reasonable third party."[49] When interpreting a contract, this Court "will give priority to the parties' intentions as reflected in the four corners of the agreement," construing the agreement as a whole and giving effect to all of its provisions.[50]

---

[46] Compl., Ex. C § 9.7.

[47] *Norton v. K-Sea Transp. Partners, L.P.*, 67 A.3d 354, 360 (Del. 2012); *Lorillard Tobacco Co., v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006) ("A court must accept and apply the plain meaning of an unambiguous term in the context of the contract language and circumstances, insofar as the parties themselves would have agreed *ex ante*.").

[48] *Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (citing *Kuhn Construction, Inc. v. Diamond State Port Corp.,* 2010 WL 779992, *2 (Del. Mar. 8, 2010)).

[49] *Salamone v. Gorman*, 106 A.3d 354, 367-368 (Del. 2014) (citing *Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)).

[50] *Id.* (citing *GMG Capital Inv., LLC. v. Athenian Venture Partners I, L.P.,* 36 A.3d 776, 779 (Del.2012)).

As this Court explained in *Country Life Homes, Inc. v. Shaffer*, a "new contract, as a general matter, will control over [an] old contract with respect to the same subject matter to the extent that the new contract is inconsistent with the old contract or if the parties expressly agreed that the new contract would supersede the old one."[51] Here, contrary to this general approach, the integration clause in the Tri-Lateral Agreement reflects that the parties intended that the Tri-Lateral Agreement would *not* supersede the Bi-Lateral Agreement:

> This Agreement and the Appendices attached hereto, including the NDA and the two MTAs, constitute the entire agreement between the Parties concerning the subject matter hereof and supersede all prior understandings, term sheets and agreements, whether written or oral, with respect to this subject, **but shall not supersede the Bi-Lateral JDAs or any other bi-lateral agreements that might exist between any combination of the Parties separately from this Agreement**.[52]

Put differently, the language in the integration clause emphasized above means that the Bi-Lateral Agreement was intended to remain in force and to operate concurrently with the Tri-Lateral Agreement upon it becoming effective. Thus, insofar as the dispute resolution provisions in the two agreements are concerned, any dispute arising under the second-in-time Tri-Lateral Agreement logically would be subject to arbitration before the AAA, while any dispute arising under the earlier Bi-Lateral Agreement would remain subject to arbitration before the ICC. This

---

[51] 2007 WL 333075, at *5 (Del. Ch. Jan. 31, 2007).

[52] Compl., Ex. C § 9.3 (emphasis added).

19

structure may not be the ideal of efficiency, but it is what the parties to the Tri-Lateral Agreement agreed to, as evidenced by its plain language.

The parties do not take issue with the notion that the Tri-Lateral and Bi-Lateral Agreements were intended to operate concurrently. UPM contended in its briefing that "[t]he Tri-Lateral JDA was drafted to operate concurrently with and subject to the parties' respective bi-lateral agreements, not only with respect to dispute resolution but in many other regards."[53] Renmatix similarly asserted that the integration clause in the Tri-Lateral Agreement "ensures that the Bi-Lateral JDAs continue to operate for the subject matter reserved to them," although it apparently views that subject matter to be more limited than UPM does.[54]

The issue over which the parties vehemently disagree is whether Renmatix may assert a claim against UPM alone under the Tri-Lateral Agreement in the first place. According to UPM, the Tri-Lateral Agreement applies only to "a three-party dispute" involving all three signatories (*i.e.*, Renmatix, UPM, and BASF) and any disagreement between just Renmatix and UPM (or just Renmatix and BASF) is governed by their respective bi-lateral agreements.[55] The only text in the Tri-Lateral Agreement UPM points to in support of this position is that the term "Parties" is

---

[53] Pl.'s Br. in Opp. to Def.'s Mot. to Dismiss 10.

[54] Def.'s Answering Br. in Opp. to Pl. Mot. for Summ. J. 26.

[55] Pl. Opening Br. in Supp. of Mot. for Summ. J. 12.

defined to mean "BASF, UPM and Renmatix."[56]  In my view, UPM's position is incorrect as a matter of law for several reasons.

To start, as Renmatix points out, the preface to the "Definitions" section of the Tri-Lateral Agreement provides that "words in the singular shall include the plural, and words in the plural shall include the singular" and that "words importing the whole shall be treated as including a reference to any part thereof."[57]  Thus, under the plain language of this provision, the term "Parties" as used in the Tri-Lateral Agreement also can refer to a single "Party."

Second, the Tri-Lateral Agreement provides that "[i]f either but not both of BASF and UPM terminate this Agreement, the other may (but is not obligated to) continue the Project with Renmatix under this Agreement or as otherwise agreed by such other Party and Renmatix."[58]  Thus, contrary to UPM's interpretation, the Tri-Lateral Agreement expressly contemplated scenarios where Renmatix could have a continuing contractual relationship only with UPM or BASF, but not both together. This point is reinforced by Recital E, which states that the three parties had been collaborating "for the purpose of providing information to facilitate *independent decisions of BASF and of UPM* with regard to potentially taking a license and

---

[56] Compl., Ex. C § 10.18.

[57] Compl., Ex. C §§ 10, 10.18.

[58] Compl., Ex. C § 5.2.

21

building production facilities to make cellulosic sugars for each company's downstream uses."[59]

Third, when the Tri-Lateral Agreement intended the mandatory participation of all three parties, it said so. For example, Section 9.9 provides, in relevant part, that the Tri-Lateral Agreement "may not be amended . . . except by an instrument in writing . . . signed by authorized representatives of all Parties."[60]

Fourth, and most importantly, the Tri-Lateral Agreement imposes various obligations that it would be illogical to construe as unenforceable unless all parties were named in an arbitration. For example, Section 2.2, which is at the heart of Renmatix's grievances in its Demand,[61] provides that "Renmatix shall be the sole owner of any invention generated from the efforts of the Parties in the course of performing [certain specified] activities under the Joint Project Plan," that "[e]ach Party shall promptly disclose to the other Parties all Inventions developed by it, its employees, Affiliates or Subcontractors during the course of the Joint Project Plan," and that "[t]he Party owning the Invention shall have the exclusive right to apply (or to choose not to apply) for or register any patents."[62] If UPM breached any of these provisions but BASF did not, or vice versa, it would make no commercial sense and

---

[59] Compl., Ex. C at 2(E) (emphasis added).

[60] Compl., Ex. C § 9.9.

[61] *See supra* I.D.

[62] Compl., Ex. C § 2.2.

lead to the absurd result of requiring that Renmatix drag both of them into an arbitration to enforce its contractual rights.[63]

The same reasoning applies to a number of other provisions in the Tri-Lateral Agreement. Section 4.3 provides that "[e]ach quarter, the Parties will pay, in advance, to Renmatix the amounts to be expended in the upcoming quarter as provided in the approved Joint Budget."[64] Section 6.1 imposes certain confidentiality obligations on the parties, which "extend beyond the term of the" Tri-Lateral Agreement.[65] Again, as a matter of commercial logic, it makes no sense that Renmatix would have no recourse under these provisions against UPM or BASF separately.

Recognizing the illogic of suggesting that Renmatix should be left without legal recourse, UPM asserts that the Bi-Lateral Agreement contains corresponding obligations to many of the provisions in the Tri-Lateral Agreement.[66] Even if true, a matter on which I express no opinion, that does not mean that Renmatix is not entitled to choose which contractual obligations it wishes to enforce against UPM and to avail itself of the dispute resolution mechanism associated with those

---

[63] *See Osborn*, 991 A.2d at 1160 (rejecting a contractual interpretation that would "reach an absurd, unfounded result").

[64] Compl., Ex. C § 4.3.

[65] Compl., Ex. C § 6.1.

[66] *See* Pl. Reply Br. in Supp. of Mot. for Summ. J. 19-20.

contractual provisions. Had the parties to the Tri-Lateral Agreement wished to circumscribe Renmatix's contractual rights to avoid this result, they were free to write language in the Tri-Lateral Agreement to do so. They did not. Instead, as discussed above, they chose to allow the Bi-Lateral and Tri-Lateral Agreements to operate concurrently.

Finally, UPM protests that Renmatix is improperly seeking to bring claims under the Bi-Lateral Agreement before the AAA because the Demand asserts that UPM has breached "multiple agreements with Renmatix."[67] Although this phrase read in isolation creates a level of ambiguity about Renmatix's intentions, it is not necessarily inconsistent with Renmatix's representation that the Demand seeks to assert claims only under the Tri-Lateral Agreement given that multiple agreements are incorporated by reference into the Tri-Lateral Agreement.[68] Significantly, moreover, Renmatix's representation is consistent with the fact that the body of the Demand specifically references sections of the Tri-Lateral Agreement as the basis for Renmatix's claims against UPM but contains no such references to the Bi-Lateral Agreement.[69] In all events, the AAA arbitrator will have the benefit of this decision

---

[67] *See* Compl., Ex. A at 39.

[68] The Tri-Lateral Agreement provides that "[t]his Agreement and the Appendices attached hereto, including the NDA [Non-Disclosure Agreement] and the two MTAs [Material Transfer Agreement], constitute the entire agreement between the Parties concerning the subject matter hereof." Compl., Ex. C § 9.3.

[69] *See supra* I.D.

to police against any attempt to bring claims arising pursuant to the Bi-Lateral Agreement into the AAA proceeding without UPM's consent.

### E.     Renmatix is Entitled to Proceed Before the AAA

The prior discussion establishes that (1) Renmatix has the contractual right to bring claims under the Tri-Lateral Agreement against UPM alone without involving BASF; (2) it has sought to assert such claims against UPM in its Demand, in particular under Sections 2.2(a) and 2.2(e) of the Tri-Lateral Agreement; and (3) claims asserted under the Tri-Lateral Agreement must be arbitrated before the AAA in accordance with the dispute resolution provision in that contract. Given these conclusions, it follows that UPM's motion for summary judgment to prevent Renmatix from arbitrating the claims in its Demand before the AAA must be denied, and that Renmatix's motion to dismiss for lack of subject matter jurisdiction must be granted.

## III.   CONCLUSION

For the reasons explained above, Renmatix's motion to dismiss for lack of subject matter jurisdiction is granted, and UPM's motion for summary judgment is denied.

**IT IS SO ORDERED.**