**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

JOSEPH R. SLIGHTS III
VICE CHANCELLOR

417 S. State Street
Dover, Delaware 19901
Telephone: (302) 739-4397
Facsimile: (302) 739-6179

Date Submitted: June 27, 2019
Date Decided: August 28 2019

William D. Johnston, Esquire
Tammy L. Mercer, Esquire
Paul L. Loughman, Esquire
Young Conaway Stargatt & Taylor, LLP
1000 North King Street
Wilmington, DE 19801

Raymond J. DiCamillo, Esquire
Kevin M. Gallagher, Esquire
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19801

Re:  *The Innovation Institute, LLC v. St. Joseph Health Source, Inc.*
     C.A. No. 2019-0156-JRS

Dear Counsel:

This case arises from a contractual dispute between a Delaware limited liability company, Innovation Institute, LLC ("Innovation"), and its founding member, St. Joseph Health Source, Inc. ("Health System"), concerning Health System's obligation to contribute funding to Innovation in accordance with Health System's constitutive document. Innovation has brought an action in this court seeking specific performance of Health Source's promise. Health System and its

appointed substitute under the LLC Agreement, St. Joseph Health Source, Inc.

("Health Source"), have moved to dismiss the operative complaint, arguing the

Court: (i) lacks personal jurisdiction over Defendants, (ii) lacks subject matter

jurisdiction over Plaintiff's claim, which they say is a claim for damages not specific

performance, and (iii) cannot provide a proper venue for the litigation because the

parties have contracted for mandatory arbitration.

For the reasons explained below, I agree with Defendants that the parties

agreed to mandatory arbitration in their constitutive document and to have questions

of substantive arbitrability determined by a California arbitrator.[1]  Accordingly, this

---

[1] It is unfortunate the Court is addressing the threshold issue of substantive arbitrability relatively late in the litigation.  The case began with preliminary injunction proceedings during which the substantive arbitrability issue was not addressed.  Nor was it the primary focus of the parties' dispositive motion practice, where the focus has been on issues of personal and equitable jurisdiction.  *See* Def.'s Opening Br. in Supp. of Its Mot. to Dismiss Verified Compl. for Specific Performance (D.I. 22) (addressing personal jurisdiction and subject matter jurisdiction before discussing arbitrability); Answering Br. of Pl. The Innovation Institute, LLC in Opp'n to Def. St. Joseph Health Source, Inc.'s Mot. to Dismiss (D.I. 25) (beginning with subject matter jurisdiction and devoting the majority of its brief to personal jurisdiction).  Defendants did raise the arbitrability/venue issue in their briefing of the motion *sub judice*, however, and, having carefully reviewed the matter, I agree the parties contracted to submit questions of substantive arbitrability to an arbitrator. Defs.' Opening Brief in Supp. of Their Mot. to Dismiss First Am. Verified Compl. for Specific Performance (D.I. 47).

action must be stayed pending the decision of the arbitrator on whether Plaintiff's

claims are subject to mandatory arbitration.

## I. BACKGROUND

The facts are drawn from the allegations in Plaintiff's First Amended Verified

Complaint (the "Amended Complaint").[2] I accept as true the Amended Complaint's

well-pled factual allegations and draw all reasonable inferences in Plaintiff's favor.[3]

### A. The Parties

Plaintiff, Innovation, is a Delaware limited liability company headquartered

in La Palma, California that develops and commercializes products, services and

ideas in the healthcare industry.[4] Using funds from its members, Innovation operates

a healthcare incubator called The Innovation Lab through which members develop

---

[2] First Am. Verified Compl. for Specific Performance ("FAC") (D.I. 34).

[3] *See Virtus Capital L.P. v. Eastman Chem. Co.*, 2015 WL 580553, at *1 (Del. Ch. Feb. 11, 2015) ("At this procedural stage, the Complaint's allegations are assumed to be true, and the plaintiff receives the benefit of all reasonable inferences.").

[4] FAC ¶ 19.

healthcare technologies and solutions.[5]  The members' financial contributions also permit Innovation to acquire portfolio companies that support its members with information technology, construction, staffing, medical coding and equipment.[6]

Defendant, Health System, is a California corporation with its principal place of business in Irvine, California.  It founded Innovation in July 2011.[7]  As explained below, in July 2015, Health System transferred its interest in Innovation to Defendant, Health Source.[8]  Health Source is a California corporation and a wholly owned subsidiary of Health System.[9]

## B. Health System Commits to Funding Innovation

On January 2, 2013, Health System and Innovation executed the Limited Liability Company Agreement of the Innovation Institute, LLC (the "Initial

---

[5] *Id.*

[6] *Id.*

[7] FAC ¶¶ 15, 19.

[8] FAC ¶¶ 15, 32.

[9] FAC ¶ 16.

Agreement").[10]    Under Section 5.4 of the Initial Agreement, Health System

"commit[ted] to fund a maximum of $40,000,000 in cash capital to [Innovation] by

establishing an account, controlled exclusively by the Founding Member, designated

as an account for the benefit of [Innovation]."[11]   Under Section 5.2, Health System

made an initial capital contribution of $20 million and thereby became Innovation's

sole founding member.[12]   That left $20 million to be set aside in the designated

account per Section 5.4.[13]

Section 5.4 further states that Health System, as the "Founding Member,"

committed to transfer some or all of the funds in the designated account to

Innovation within two business days of a request made by the manager of

Innovation, Pacific Healthcare Management ("PHM").[14]  Upon transfer of some or

---

[10] FAC ¶ 21; FAC, Ex. 2 (the "Initial Agreement").

[11] Initial Agreement § 5.4.

[12] Initial Agreement § 5.2; FAC ¶ 22.

[13] Initial Agreement § 5.4.

[14] *Id.*

all of the committed funds, Health System is to receive commensurate additional

units in Innovation.[15]

In Section 13.13 of the Initial Agreement, Innovation and Health System also

adopted a broad arbitration provision, which provides:

> Except to the extent that a party is entitled to equitable relief, each of the parties hereto irrevocably waives any right to trial by jury and irrevocably agrees that any disputes arising out of or relating to this Agreement or any other agreement or instrument executed in connection herewith or in connection with the transactions contemplated hereby shall be submitted to binding arbitration in accordance with the then effective commercial dispute resolution procedures of the American Arbitration Association. Any such arbitration proceeding shall be conducted in Orange County, California using a single arbitrator and the parties hereby irrevocably consent to such location and waive any right to assert any claim that such location is an inconvenient forum for resolving any such disputes. The aforementioned choice of forum is intended by the parties to be mandatory and not permissive in nature, thereby precluding the possibility of litigation or arbitration between the parties with respect to or arising out of this Agreement in any jurisdiction other than that specified in this paragraph.[16]

---

[15] *Id.*

[16] Initial Agreement § 13.13.

### C. Health System Forms Health Source to Transfer Its Membership Interests in Innovation

In the years following the Initial Agreement, additional members joined Innovation, diluting Health System's ownership stake and risking Health System's tax-exempt status.[17]  Accordingly, on July 1, 2015, Health System transferred all its interest in Innovation to a wholly owned subsidiary called Health Source.[18]

On December 31, 2015, Innovation, its members and PHM executed an Amended and Restated Operating Agreement (the "Operating Agreement") to reflect the substitution of Health Source for Health System as the Founding Member.[19]  The definition of Founding Member was changed to mean "[Health System], [. . .], or an entity wholly owned by [Health System], directly or indirectly,

---

[17] FAC ¶¶ 30, 31; Aff. of Joe Randolph in Supp. of Opp'n to Defs.' Mot. to Dismiss the First Am. Compl. for Specific Performance ("Randolph Aff.") (D.I. 54) ¶¶ 13, 15–16; *id.*, Ex. A. at 3; *see also* FAC ¶ 29 (explaining that once Health System's interests were diluted below 50 percent, PHM obtained "full power, authority, and discretion to manage and control the business" under the Management Services Agreement).

[18] Randolph Aff. ¶¶ 15–18.  *See generally id.*, Exs. A, B and C.

[19] FAC ¶¶ 38, 39; FAC, Ex. B ("Operating Agreement").

and admitted as a Substitute Member of [Health System]."[20]   The provision concerning Health System's commitment to set aside funds was also changed to require "[Health System to] transfer funds from the Designated Account to the Company either directly or through an entity wholly owned by [Health System] and admitted as a Substitute Member of [Health System], within two days as directed by PHM."[21]

### D. Innovation Seeks to Enforce Health Source's Obligation to Transfer $20 Million from the Designated Account

On February 6, 2019, PHM notified the Chief Financial Officer of Health System that Innovation required the remaining $20 million in committed funds within two business days as provided in Section 5.2 of the Operating Agreement.[22] In response, Health System sought information regarding the fair market value of Innovation, the number of additional units it would receive in exchange for the funds

---

[20] FAC ¶ 39; Operating Agreement, 6.

[21] Operating Agreement § 5.2.  The arbitration provision from Section 13.13 of the Initial Agreement remained the same.  *See* Operating Agreement § 13.13.

[22] FAC ¶ 50; FAC, Ex. G (letter from Randolph to Escasa-Haigh dated Feb. 6, 2019).

and Innovation's plans for the additional cash capital.[23] PHM responded the same day with a letter to the general counsel for Health Source, stating that Health System's commitment to deliver the remaining $20 million was not subject to its receipt of information regarding Innovation's operations or its plans for the funds.[24]

On February 12, 2019, Health System's CFO sent a letter to Innovation demanding access to Innovation's books and records.[25] PHM responded a few days later reiterating its position that Innovation was entitled to the designated funds without conditions.[26]

### E. Procedural Posture

Innovation filed its first complaint along with a motion to expedite on February 25, 2019, seeking specific performance of Health Source's contractual obligation to deliver $20 million to Innovation within two days, as per Section 5.2

---

[23] FAC ¶ 51; FAC, Ex. H (letter from Escasa-Haigh to Randolph dated Feb. 8, 2019).

[24] FAC ¶ 53; FAC, Ex. I (letter from Randolph to the general counsel of Health Source dated Feb. 8, 2019).

[25] FAC ¶ 54; FAC, Ex. J (letter from Escasa-Haigh to Randolph dated Feb. 12, 2019).

[26] FAC ¶ 55; FAC, Ex. K (letter from Randolph to Escasa-Haigh dated Feb. 15, 2019).

of the Operating Agreement.  On March 6, 2019, I granted Plaintiff's motion to expedite upon finding Plaintiff had demonstrated a colorable claim and a threat of irreparable harm if the $20 million additional capital contribution was not received in time for Innovation to use the funds as collateral for financing a pending transaction.  I granted that motion over Health Source's objections (that were based on lack of subject matter and personal jurisdiction and improper venue), but noted I would not require Health Source to defend on the merits until the threshold jurisdictional issues were adjudicated.

Health Source raised its threshold defenses in a motion to dismiss filed the following day, on March 7, 2019.[27]  Three days after oral argument on the motion to dismiss, Innovation notified the Court that the pending transaction had been terminated and requested that the Court hold its opinion on the motion to dismiss in abeyance.[28]  On March 25, 2019, Innovation filed its Amended Complaint, naming

---

[27] D.I. 19.

[28] D.I. 30.

Health System as a defendant. Defendants filed their renewed motion to dismiss on April 18, 2018.[29] I heard oral argument on the renewed motion on June 27, 2019.

## II. ANALYSIS

Defendants maintain Innovation has packaged its claim as a claim for specific performance (an equitable remedy) to avoid the dispute resolution provision of the Operating Agreement, which arguably provides an exception to mandatory arbitration "to the extent that a party is entitled to equitable relief."[30] According to Defendants, Innovation's claim is more accurately characterized as a claim at law for damages and, therefore, should be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1). Alternatively, Defendants maintain the Court should stay the matter to allow a California arbitrator to decide the question of substantive arbitrability.[31]

---

[29] D.I. 47.

[30] Operating Agreement § 13.13.

[31] Defendants also moved to dismiss under Rule 12(b)(2) for lack of personal jurisdiction. The personal jurisdiction questions here (whether an entity can assign its jurisdictional contacts to a wholly owned subsidiary) are interesting and new to the Court, but I need not address them in light of my holding on substantive arbitrability. *See Kahuku Hldgs., LLC v. MNA Kahuku, LLC*, 2014 WL 4699618, at *5 (Del. Ch. Sept. 15, 2014) (declining to

It is well settled that "Delaware courts lack subject matter jurisdiction to resolve disputes that litigants have contractually agreed to arbitrate."[32] Accordingly, the court frequently is confronted with the "rather arcane" question of whether an agreement's arbitration provision requires parties to submit their dispute regarding substantive arbitrability to an arbitrator.[33] When deciding matters relating to contractual commitments to arbitrate, this court turns first to the Delaware Uniform Arbitration Act (the "DUAA").[34] Under the DUAA, unless the agreement at issue explicitly references the DUAA, the courts of this state will incorporate the Federal

---

make a determination on personal jurisdiction after concluding the parties' arbitration provision divested the court of subject matter jurisdiction).

[32] *NAMA Hldgs., LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 429 (Del. Ch. 2007).

[33] *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 945 (1995).

[34] *Meyers v. Quiz-Dia LLC*, 2016 WL 7048783, at *2 (Del. Ch. Dec. 2, 2016).

Arbitration Act ("FAA") as the binding source of statutory law.[35]  The Operating

Agreement makes no reference to the DUAA, so the FAA applies.[36]

When an arbitration clause is governed by the FAA, a court "deciding whether

the parties agreed to arbitrate a certain matter (including arbitrability) . . .  should

apply ordinary state-law principles that govern the formation of contracts."[37]  In this

regard, Delaware recognizes an exception to the general rule that "courts should

decide questions of substantive arbitrability"[38] when the parties' contract provides

---

[35] 10 *Del. C.* §§ 5702(a), (c); *see also Lewis v. AimCo Props., L.P.*, 2015 WL 557995, at *3 (Del. Ch. Feb. 10, 2015) (quoting 10 *Del. C.* §§ 5702(a), (c)) ("pursuant to 10 *Del. C.* § 5702, unless an arbitration agreement complies with the standard set forth in Section 5702(a) by 'specifically referencing the [DUAA] . . . and the parties' desire to have it apply to their agreement,' Section 5702(c) provides that 'any application to the Court of Chancery to enjoin or stay an arbitration, obtain an order requiring arbitration, or to vacate or enforce an arbitrator's award shall be decided by the Court of Chancery in conformity with the [FAA], and such general principles of law and equity as are not inconsistent with the Act.'").

[36] I also note the Operating Agreement involves interstate commerce and calls for arbitration in California, which further supports the application of the FAA. *See McLaughlin v. McCann*, 942 A.2d 616, 621 (Del. Ch. 2008) (applying the FAA where the agreement involved interstate commerce, called for arbitration in Pennsylvania and was not subject to the DUAA).

[37] *First Options of Chicago, Inc.*, 514 U.S. at 944.

[38] *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 78 (Del. 2006).

"clear and unmistakable evidence" of their intent that an arbitrator should decide the question.[39] In the seminal *Willie Gary* decision, our Supreme Court articulated a two-part test to determine whether an agreement contains clear and unmistakable evidence the parties agreed to submit the issue of arbitrability to the arbitrator: (1) the arbitration provision must generally provide for arbitration of all disputes; and (2) the provision must incorporate a set of arbitration rules that empower the arbitrator to decide arbitrability.[40]

In *McLaughlin v. McCann*, then-Vice Chancellor Strine provided what is now regarded as definitive guidance regarding the application of the *Willie Gary* test.[41] Of particular relevance here, *McLaughlin* cautioned against an overly narrow

---

[39] *See Redeemer Comm. of the Highland Crusader Fund v. Highland Capital Mgmt., L.P.*, 2017 WL 713633, at *3 (Del. Ch. Feb. 23, 2017) (citation omitted).

[40] *Willie Gary*, 906 A.2d at 79.

[41] *McLaughlin*, 942 A.2d at 618; *see also Greenstar IH Rep, LLC v. Tutor Perini Corp.*, 2017 WL 715922, at *5 (Del. Ch. Feb. 23, 2017) (citing *McLaughlin* with approval and collecting cases)); *Redeemer Comm. of the Highland Crusader Fund*, 2017 WL 713633, at *3 (same); *Legend Natural Gas II Hldgs., LP v. Hargis*, 2012 WL 4481303, at *6 (Del. Ch. Sept. 28, 2012) (same); *Carder v. Carl M. Freeman Cmtys., LLC*, 2009 WL 106510, at *5–7 (Del. Ch. Jan. 5, 2009) (same).

reading of *Willie Gary*'s first requirement that otherwise could be read to disable the arbitrator from deciding arbitrability unless the "arbitration clause [] refer[red] all disputes to arbitration without exception. . . ."[42]  After noting the "general tenor" of *Willie Gary* "indicates that the Delaware Supreme Court believes a reference to the AAA Rules has a critically important role in determining whether the parties intended to arbitrate arbitrability," the court clarified, with regard to the first element:

> [the] requirement is that the carveouts and exceptions to committing disputes to arbitration should not be so obviously broad and substantial as to overcome a heavy presumption that the parties agreed by referencing the AAA Rules and deciding to use AAA arbitration to resolve a wide range of disputes that the arbitrator, and not a court, would resolve disputes about substantive arbitrability.  In a case where there is any rational doubt about that, the court should defer to arbitration, leaving the arbitrator to determine what is or is not before her.[43]

---

[42] *McLaughlin*, 942 A.2d at 624.

[43] *Id.* at 625.  Courts have previously interpreted *McLaughlin* to add a third prong to the *Willie Gary* test: that the Court will not refer a frivolous issue of arbitrability to an arbitrator.  *See Angus v. Ajio, LLC*, 2016 WL 2894246, at *3 (Del. Ch. May 13, 2016); *UPM-Kymmene Corp. v. Renmatix, Inc.*, 2017 WL 4461130, at *4 (Del. Ch. Oct. 6, 2017).  But given the United Supreme Court's recent holding in *Henry Schein, Inc. v. Archer & White Sales, Inc.*, that the "wholly groundless" exception to arbitrability is inconsistent

Having subjected the arbitration provision at issue to the *Willie Gary* test, as clarified

by *McLaughlin*, I conclude the Operating Agreement contains clear and

unmistakable evidence of the parties' agreement to submit the issue of arbitrability

to the arbitrator. Again, the arbitration provision states, in part:

> Except to the extent that a party is entitled to equitable relief, any disputes arising out of or relating to this Agreement . . . shall be submitted to binding arbitration in accordance with the then effective commercial dispute resolution procedures of the American Arbitration Association. Any such arbitration proceeding shall be conducted in Orange County, California . . . and the parties hereby irrevocably consent to such location and waive any right to assert any claim that such location is an inconvenient forum for resolving any such disputes. The aforementioned choice of forum is intended by the parties to be mandatory and not permissive in nature, thereby precluding the possibility of litigation or arbitration between the parties with respect to or arising out of this Agreement in any jurisdiction other than specified in this paragraph.[44]

The parties expressly incorporated the AAA arbitration rules. And the exception

"to the extent that a party is entitled to equitable relief" is not "so obviously broad

---

with the preference for arbitration embodied in the FAA, I do not address this third element. 139 S. Ct. 524, 528 (2019).

[44] Operating Agreement § 13.13.

and substantial as to overcome a heavy presumption" that the parties intended to submit their disputes to an arbitrator, including disputes over substantive arbitrability.[45] While I acknowledge this is a close call, that fact is all the more reason to defer substantive arbitrability to the arbitrator.[46]

Where, as here, "the issue involved in . . . [a] proceeding is referable to arbitration," the FAA provides for a stay of proceedings.[47] Accordingly, Innovation's claim under the Operating Agreement is stayed pending the arbitrator's decision. If the arbitrator determines the claim is arbitrable, then this action will be

---

[45] *McLaughlin*, 942 A.2d at 625. *See also Greenstar*, 2017 WL 715922, at *5–6 (deferring arbitrability where agreement included an exception "with respect to injunctive relief"); *BAYPO Ltd. P'ship v. Tech. JV, LP*, 940 A.2d 20, 26–27 (Del. Ch. 2007) (deferring arbitrability where exception was "tailored to provide the parties with limited ancillary relief to protect their interests during the pendency of the arbitration process").

[46] *See Cantor Fitzgerald, L.P. v. Prebon Sec. (USA) Inc.*, 731 A.2d 823, 831 (Del. Ch. 1999) ("When parties to a federal arbitration agreement dispute whether a particular claim or controversy should be litigated in the courts or subject to mandatory arbitration and there is, in fact, doubt as to whether the parties to the agreement ever expected or wanted the claim or controversy to be arbitrated, there is no question federal law requires that the doubt be resolved in favor of arbitration . . . even where, as here, litigation in a court would be faster, more efficient, less costly and more reasonable under all of the circumstances.").

[47] *Meyers*, 2016 WL 7048783, at *3 (citing 9 U.S.C. § 3).

dismissed for lack of jurisdiction because arbitration provides a legal remedy.[48] If the arbitrator determines the matter is not arbitrable, then the parties may return to this Court for further proceedings.

## III. CONCLUSION

For the reasons set forth above, this action is **STAYED**. Plaintiff shall elect whether to submit the issue of substantive arbitrability to a California arbitrator, per the Operating Agreement, within thirty (30) days. If Plaintiff initiates arbitration for this purpose, the stay will continue pending the arbitrator's decision. If Plaintiff elects not to initiate arbitration within thirty (30) days, Defendants shall so notify the Court and submit a proposed form of order dismissing this action with prejudice for want of subject matter jurisdiction and improper venue.

**IT IS SO ORDERED.**

Very truly yours,

*/s/ Joseph R. Slights III*

---

[48] *See id.* at *7 (citing *Julian v. Julian*, 2009 WL 2937121, at *3 (Del. Ch. Sept. 9, 2009)).